[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 283 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 284 
¶ 1. Randy Lloyd Sandefer was convicted by a Lee County Circuit Court jury of "burglary and larceny of a dwelling." He was sentenced to twenty-five years in the custody of the Mississippi Department of Corrections with eight years suspended and five years post-release supervision. Seeking to overturn his conviction and sentence, he asserts that the trial court erred in allowing the State to admit photographs of stolen money, that the trial court erred in refusing to grant him a new trial or directed verdict because there was no evidence that he was in the house without consent, that the trial court erred in refusing to allow Tracy Allen to testify for the defense, that the trial court erred in refusing to allow a witness's juvenile convictions to be used for impeachment purposes, that the trial court erred in refusing to grant a mistrial based on the State's references to other inadmissible acts, that the trial court erred in refusing to grant a new trial based on the sufficiency of the evidence, and that cumulative errors demand the reversal of his conviction.
 ¶ 2. We find that the court erred in refusing to allow Allen to testify, and we therefore reverse and remand for a new trial consistent with this opinion.
 FACTS ¶ 3. In 2003, Dr. Roma Taylor lived and worked in Orange Beach, Alabama. Dr. Taylor also owned a house in Lee County, just south of Tupelo, where her son, Dustin Wesson, and her ex-husband, Dr. Tom Wesson, lived. Nicole Vinson, Sandefer's sister, was Dustin's long-time girlfriend. Vinson and Sandefer were frequent and welcome guests at Dr. Taylor's house.
 ¶ 4. The basement of Dr. Taylor's Lee County house contained a "safe room" in which Dr. Taylor kept some valuable items, including old deeds, inherited money, coins, photos, art, and her late grandfather's ring. Dr. Taylor last saw the valuables during an April 20, 2003 visit.
 ¶ 5. On May 1, 2003, Sandefer and his friend, Jay West, were being chauffeured around Saltillo, Mississippi, in a limousine. They stopped at Dixon's Travel Center in order for Sandefer to purchase a cell phone charger. At that time, Sandefer asked a clerk at Dixon's to exchange $600 in twenty-dollar bills for one-hundred-dollar bills. After receiving the one-hundred-dollar bills, Sandefer and West left the store. Another Dixon's employee noticed that the twenty-dollar bills did not look like modern currency, suspected that they were counterfeit, and called the Saltillo Police Department. A police officer picked up the money and took it to the police department where photocopies of the money were made. The bills were then taken to a local bank where employees determined that the money was authentic currency from the 1950s. The money was then returned to Dixon's.
 ¶ 6. Dr. Taylor received information that her house may have been burglarized, and she was asked to examine the contents of her safe room. When she returned to the Lee County house on July 4, 2003, she *Page 285 
discovered that some of her valuables were missing, specifically $6,000 in cash that had belonged to her grandmother. Dr. Taylor described the currency as tens, twenties, and one-hundred-dollar bills from the 1930s through the 1950s.
 ¶ 7. Sandefer and Vinson were indicted on October 19, 2004, for the burglary of Dr. Taylor's home. Their trial commenced on May 9, 2005. West and Mark Gillespie, a former friend of Sandefer's, both testified that Sandefer admitted to them that he stole money from Dr. Taylor's house. At the close of the State's case, Sandefer's and Vinson's attorneys moved for a directed verdict. Vinson's attorney argued that the State had put forth no evidence that Vinson was involved in any way with the burglary. Sandefer's attorney argued that the indictment was defective insofar as it charged Sandefer with burglary under Mississippi Code Annotated section 97-17-23 rather than Mississippi Code Annotated section 97-17-29. He contended that under section 97-17-23, the State was required to prove that Sandefer was in the house illegally. He reasoned that the State failed to meet that element of the crime because the State's own witnesses stated that Sandefer was always a welcome guest in Dr. Taylor's home. Sandefer's attorney also argued a lack of sufficient evidence, stating that the State failed to prove that Sandefer was ever in the room or that he was ever in possession of the entire $6,000. The court granted a directed verdict in favor of Vinson and denied a directed verdict for Sandefer.
 ¶ 8. Additional facts, if necessary, will be related during our analysis and discussion of the issues.
 ANALYSIS AND DISCUSSION OF THE ISSUES 1. Admission of Photocopies
 ¶ 9. Sandefer contends that the court improperly allowed into evidence photocopies of the money exchanged at Dixon's. Sandefer bases this objection primarily on the ground that the State "admitted that it could not prove beyond all doubt that the photocopied money came from Dr. Taylor's house." Sandefer contends that the admission of the photocopies was prejudicial to his case. Our standard or review regarding the admission of evidence is abuse of discretion, and "[w]e will not reverse the trial court's evidentiary ruling unless the error adversely affects a substantial right of a party." Mingo v.State, 944 So.2d 18, 28 (¶ 27) (Miss. 2006) (citingParks v. State, 884 So.2d 738, 742 (¶ 9) (Miss. 2004)).
 ¶ 10. In affirming its decision to allow admission of the photocopies, the court stated:
 The Court is satisfied that there has been the introduction of circumstantial evidence from the testimony of the State's witnesses that would tie the monies that have been photocopied to the burglary of the home of Ms. Wesson, and I am going to allow the introduction of the photocopies.
 With that said, I fully acknowledge that there has been no direct proof that this is the money that came from this house, and I expect [defense counsel] to make that argument at the time of closing argument. The Court is simply acknowledging that there is circumstantial evidence that ties old money that was in the hands of Randy Sandefer to the Wesson home and that the witness West has testified that Sandefer told him that that's the location where the money came from.
 The Court finds that that evidence is relevant for the jury to decide it, and it will be a decision for the jury as to *Page 286 
whether or not they think that there's a sufficient proof, direct proof, as to Mr. Sandefer and Ms. Vinson being responsible for taking that money.
Under these circumstances, the court did not abuse its discretion by allowing admission of the photocopies. Dr. Taylor testified that the money in the photocopies looked like the money taken from her home. West testified that Sandefer had told him that he had gotten the money from Dr. Taylor's home.
 ¶ 11. As support, Sandefer cites Cummings v.State, 219 So.2d 673, 678 (Miss. 1969), where the Mississippi Supreme Court held that the admission of a one-hundred-dollar bill into evidence was prejudicial to the defendant's right to a fair trial because "the bill . . . was never identified as the one taken from the Lowndes County Co-op." Nothing in Cummings indicates that the bill was special or unique, and Cummings' conviction was reversed on other grounds as well. The situation is notably different here, as there was testimony that the bills exchanged at Dixon's resembled bills taken from Dr. Taylor's house and there was testimony that Sandefer had said that he got the bills in question from Dr. Taylor's home.
 ¶ 12. The court did not err in determining that the probative value of the evidence outweighed any prejudicial effect. Questions as to whether the money was actually the money taken from Dr. Taylor's home were raised by the defense, as seen by the thorough cross-examination of Dr. Taylor regarding perceived discrepancies in the dates on the bills. The jury was entitled to weigh the evidence and assign it the weight it felt appropriate. Mingo, 944 So.2d at 33 (¶ 57). The court did not abuse its discretion, and this contention of error is without merit.
2. Consent as Defense
 ¶ 13. Sandefer contends that he should have been granted a new trial or directed verdict on the ground that there was no evidence produced to show that he was in Dr. Taylor's house unlawfully. Specifically, Sandefer claims that "there was no evidence that he was ever unlawfully in Dr. Taylor's home or had broken and entered into her home or was present in her home without consent." Sandefer claims that, based on his lawful presence in the home, he should have been indicted under Mississippi Code Annotated section 97-17-29, rather than section 97-17-23.
 ¶ 14. We begin with the two statutes relevant to this case. Mississippi Code Annotated section 97-17-23, as revised, reads as follows:
 Every person who shall be convicted of breaking and entering the dwelling house or inner door of such dwelling house of another, whether armed with a deadly weapon or not, and whether there shall be at the time some human being in such dwelling house or not, with the intent to commit some crime therein, shall be punished by imprisonment in the Penitentiary not less than three (3) years nor more than twenty-five (25) years.
 (emphasis added). Section 97-17-29 reads: "Every person who, being lawfully in the dwelling house of another, shall break an inner door of the same house, with intent to commit a crime, shall be guilty of burglary, and imprisoned in the penitentiary not more than ten years." (emphasis added).
 ¶ 15. It is readily obvious from a clear reading of the two statutes that they proscribe different conduct. Section 97-17-23 makes it a burglary to break and enter either the dwelling house (the entrance door) or, once in, an inner door. Section 97-17-29 makes it a burglary to break (one *Page 287 
does not have to enter) an inner door of a house that one is lawfully in. So, under section 97-17-29, if one breaks an inner door, even if he does not enter it, he has committed a burglary, provided he had the intent to commit a crime at the moment of the breaking and provided further he was lawfully in the dwelling.
 ¶ 16. The legislature's choice of wording in section 97-17-23 prescribes two ways that a burglary may be committed by an intruder and at least one way that it may be committed by an invited guest or by one with permission to be in the dwelling, each different from the proscribed conduct set forth in section 97-17-29, which admittedly applies only to persons who have permission to be on the premises. If it were the intent of the legislature in section 97-17-23 to only address situations where the burglar is on the premises unlawfully, it would have qualified the phrase, "Every person," by adding the phrase, "who, being unlawfully in the dwelling." The legislature was clearly cognizant of the strategic value of such limiting language, as shown by its choice of language in section 97-17-29, where it added the qualifier — "who, being lawfully in the dwelling house of another" — to make clear that the proscribed conduct applies to only one category of persons. Since there is language in section 97-17-29 which makes clear that this section does not apply to intruders, there can be no legitimate argument that it does. On the other hand, there is no qualifying language in section 97-17-23. Therefore, there can be no legitimate argument that the statute's application is limited to intruders, unless some restrictive language to that effect is judicially imposed on the statute.
 ¶ 17. It is not the proper role of a court to construe an unambiguous statute in a way contrary to its plain meaning. There is nothing ambiguous about the wording of section 97-17-23. The fact that section 97-17-29 also exists does not make section 97-17-23 ambiguous, because section 97-17-23, by its plain wording, applies to "every person," while section 97-17-29, by its plain wording, applies only to those persons who happen to be lawfully in the dwelling. Surely, an invited guest is a person; therefore, a guest falls within the ambit of97-17-23. Further, the burglary described in section 97-17-29
only requires a breaking of an inner door with the intent to commit a crime by one who is lawfully on the premises, while section 97-17-23 requires a breaking and entering of either the dwelling or an inner door with the intent to commit a crime. Clearly, section 97-17-23 describes two distinct scenarios of how a burglary may be committed. It is nonsensical to say that, under section 97-17-23, one, who breaks and enters, without permission, a locked, inner door of a dwelling with the intent to commit a crime therein, is not a burglar simply because he had permission to enter the outer, or entrance, door of the dwelling. That he also could have been prosecuted under section 97-17-29 does not mean that a prosecution under 97-17-23
is illegal.
 ¶ 18. Further, under section 97-17-23, a burglary is not committed by one who enters a dwelling with permission with no intent to commit a crime therein but steals something while in the dwelling without breaking and entering an inner door to effectuate the theft. On the other hand, a burglary is committed under section 97-17-23 by one who has permission to enter the dwelling (the outer or entrance door) of another but once inside, breaks and enters, without permission, an inner door of a room of that dwelling with the intent to commit some crime therein.[1] *Page 288 
 ¶ 19. It is true that there was uncontested testimony that Sandefer was a frequent and welcome guest in Dr. Taylor's home. However, Dr. Taylor made it amply clear that neither Sandefer, nor anyone else except her former husband, had permission to be in the house's safe room:
 Q. Okay. Let's talk for a moment about the basement in your home. Could you describe that basement, what it's like, what it's made up of.
 A. It's poured reinforced concrete where we have garage doors to park the cars, and in the very center is a secure room for valuables that has a metal door with two locks.
 Q. And within that secured room with a metal door and two locks, what did you keep in there?
 A. Valuables that I had inherited from my family.
 Q. Could you describe those valuables.
 A. Old deeds, old money, coins, photos, some art. My granddad's ring that he had willed to me when I was seven was my most valuable possession.
 Q. Do you know where that ring is today?
 A. No, I don't.
 Q. Was that room kept locked at all times?
 A. All times.
 Q. Who had a key to that room?
 A. No one but Tom and I.
 Q. Did Dustin even have a key to that room?
 A. No.
 Q. Where did you keep your key to that room, Doctor?
 A. I couldn't carry all those keys around with me all the time, so I had several places that I would put that key in case someone found it that when they went back it would be at a different place. So I rotated it around several places near the entrance to that door, which was quite cluttered and it was easy to find places to conceal it.
 Q. Were these places that you kept your key to that room, were these definite places?
 A. Yes.
 Q. Now, will you describe the old money, how much of it?
 A. $6,000.
 Q. And where was that kept?
 A. It was kept in a satchel that I got from my mom when she passed away. It was money that I was told my grandmother had used as emergency money. And when she died, my — it went to my mom's house. And then when my mom died, I just took the satchel to my house.
 Q. The $6,000 of old money, do you recall the years of those bills, the series?
 A. I did not look at the dates on the bills. I say I had been home and cleaned out that room to store some things in there and had been through that satchel where the roll *Page 289 
of old bills were, and I counted them because I owed half of that to my sister, and I wanted to know how much I owed her. But I put it back in there where it was — I felt it was secure, and I didn't count anything else and locked the door back and left.
 Q. Okay. My question is how old were those bills?
 A. I believe they were from the `20s, `30s, `40s. My grandmother died in `59, so they would have been before then.
 Q. Because she had kept the money.
 A. Yes.
 Q. Is that right? So this was an inheritance of yours?
 A. Yes.
 ¶ 20. Dr. Taylor further testified that when she returned home on July 4, her valuables from the locked room were missing. She explained in the following colloquy:
 Q. Did you have an occasion to examine and look in that room that was secured in your basement for your valuables?
 A. I did.
 Q. Was your key located where you had left it?
 A. No.
 Q. You couldn't get into the room without your key. How did you get into the room on that day?
 A. I borrowed Tom's key.
 Q. And what did you find when you entered your locked — doubled locked secured room in your basement?
 A. My safe was gone and the satchel was empty except for a couple of ion-valuable items.
 Q. The other additional money that you said was several thousand dollars, was it there?
 A. No.
 Q. It was gone?
 A. Gone.
 Q. Entirely?
 A. I couldn't find anything of value left in my basement or secure room except a small amount of the junk silver was left behind, and it — those containers had been opened, and I had never opened them.
 ¶ 21. During his testimony, Sandefer did not claim that he had permission to be in the safe room, but rather testified that he had no knowledge of the room or its contents:
 Q. Did Dr. Taylor ever tell you about there being a basement room with any money or valuables in it?
 A. No, sir. I never knew of a room.
 Q. Were you ever given any keys to such a room by Dr. Taylor or Tom Wesson or anybody else?
 A. I never received any type of key from them.
 Q. Did you ever enter into such a room?
 A. No, I did not.
 Q. Did you take any money from the room in Dr. Taylor's house?
 A. I never took any money from — anything from them at all.
On cross-examination, Sandefer first acknowledged that he did not have "the run of the house" but later stated that he could go anywhere he wanted in the house. However, he did not testify that he had permission to enter the room from where the items were stolen, asserting instead that he "never knew about a strong room in the basement." *Page 290 
 ¶ 22. The testimony of West, Gillespie, and Sanders also shows that Sandefer committed a burglary under section 97-17-23. Tanya Sanders, a Dixon's employee, testified that she was working in May 2003 when Sandefer and Jay West came in to exchange some old twenty-dollar bills for one-hundred-dollar bills. Gillespie, who had been friends with Sandefer, testified that on or around the first of May 2003, Sandefer showed him a wallet that contained approximately $3,000 and advised him that it was old money that he had gotten from Dustin Wesson's house in a tube with plastic caps on the end. Dr. Taylor testified that she had never told anyone before trial that the money in her safe room was located in a tube with plastic caps. West testified that Sandefer admitted to him that he taken the money from a double-locked room in Dr. Taylor's house.
 ¶ 23. The dissent cites Davis v. State,611 So.2d 906 (Miss. 1992), Mason v. State, 344 So.2d 144, 145
(Miss. 1977), Holderfield v. State, 215 Miss. 564,61 So.2d 385 (1952), and Mitchell v. State, 720 So.2d 492
(Miss.Ct.App. 1998) for the proposition that lack of consent must be proven for a conviction of burglary. We agree. However, two observations are in order. First, the dissent fails to accept that Sandefer did not have Dr. Taylor's consent to enter the safe room, as her testimony made clear. Further, there is no evidence or suggestion that either Dr. Wesson or Dustin gave Sandefer permission to break and enter the double-locked room. While the State did not offer evidence that neither Dustin nor Dr. Wesson gave Sandefer permission to enter the safe room, Sandefer's testimony negated any such inference, because he testified that he did not know such a room existed. Second, none of the cases cited by the dissent addresses the breaking and entering of the inner door of a building, without consent, when the burglar has permission to be on the premises generally. Therefore, these cases are distinguishable and are not dispositive of the issue in this case.
 ¶ 24. The evidence offered by the State is sufficient to support the jury's verdict that Sandefer burglarized the secure room in Dr. Taylor's home. As Dr. Taylor's testimony showed, Sandefer did not have permission to be in the locked basement room. Sandefer's proposed jury instruction that would have instructed the jury that it must find him innocent if it found that he was lawfully in the home generally was in error. The court did not err in refusing to grant Sandefer a directed verdict or new trial. There is ample evidence that Sandefer had permission to visit Dr. Taylor's home at will. However, there is absolutely no evidence that that permission encompassed the right to break and enter a locked room in the basement of the home, which is what happened in this case. This contention of error is without merit.
3. Denial of Witness
 ¶ 25. Sandefer contends that the court erred in refusing to allow Tracy Allen to testify before the jury. The basis of the court's ruling was that Allen's existence was only revealed to the State late on the second day of Sandefer's trial. Defense counsel averred that this was not due to any wilful tardiness on his part, but because he only learned of Allen's existence during the second day of trial.[2]
 ¶ 26. We note at the outset that there is nothing in the record to suggest that defense *Page 291 
counsel's statement that he only learned of Allen's existence during trial was false. In broaching the subject with the court and the State, counsel stated:
 There is a matter that I do need to bring to the attention of the Court. That note that was brought in that Chip thought was from Ms. Loftin actually was a note — there is a gentleman by the name of Tracy Allen. I have — this has only now come to my attention, Your Honor. His name is Tracy Allen. I've never known of him. No one has ever mentioned him to me before. . . . I've just interviewed him right now.
This statement was supported by Allen's sworn testimony regarding his first contact with the defense:
 Q. Did you — had you ever spoken to me before we met just a short while ago today?
 A. Unh-unh.
 Q. Did you have any knowledge about this case?
 A. Unh-unh. I didn't know nothing about it. I was coming up here to support Nicole. I didn't know what was going on about the whole deal. You know, I knew this was a long time ago, whatever happened, you know, what — what that happened, you know.
 ¶ 27. In objecting to Allen's introduction, the State did not contend that the defense had wilfully withheld Allen's identity, but rather argued:
 Your Honor, this is highly prejudicial. This is trial by ambush. Announcing a witness at the — you know, halfway in a trial that you're going to call a witness like this after having given us four witnesses this morning that they're going to call that they just didn't know about until now is just prejudicial.[3]
It's too big a burden to meet. We're in the midst of a trial. We can't prepare. It would be just like giving them no discovery, no names of any witnesses and then giving them to them in the middle of the trial.
After stating that it agreed with the State's take on the matter, the court ruled:
 Well, I understand that if the witness Mr. Allen were to testify to what you purport that has been reported to you he would testify to, it certainly would be, could be important to your client. But it's second day of trial. It's 3:30. State has rested. I'm doing my best to get through this trial in a timely manner, and we simply can't deal with new witnesses as they spring up in every direction. So the Court is not going to allow Mr. Allen to testify.
 ¶ 28. The substance of Allen's proposed testimony was introduced through a proffer made while the jury was not present. In the interest of thoroughness, we quote from Allen's proffer:
 Q. Have you ever been to Dustin Wesson's home?
 A. Yes, sir.
 Q. Were you ever there — would you say you had been there frequently or infrequently?
 A. Frequently.
 Q. Had you ever been present at Dustin Wesson's home when there were certain parties going on?
 A. All time [sic].
 Q. What kind of parties were these, how many people were present? *Page 292 
 A. Stripper, 20, 30 people, dope. Just you name it.
 Q. And this was going on how frequently?
 A. From Thursday to Saturday every week.
 Q. Would you — did you ever see Mr. Sandefer present at any of those?
 A. No, sir.
 * * * *
 Q. Did you ever find out about the fact that some money came up missing at Dustin Wesson's home?
 A. Yes, sir.
 Q. How did you come to find out about that?
 A. Well, because him and, like I say, [another individual][4] got into it about it, because we found out that he stole some money and he was trying to pay it back in dope debts, so —
 Q. Okay. Who is [the other individual]?
 A. [A relative] I guess. . . .
 Q. Did [the individual] stay out at —
 A. Yes, sir.
 Q. — the Taylor home?
 A. Yes, sir.
 Q. Tell me about what you — what you know.
 A. I know —
 [PROSECUTOR]: For the record, Your Honor, were this evidence offered at trial, I would object to any hearsay of any out-of-court statements made by any witnesses.
 [COURT]: Court notes that and would sustain that objection.
 [DEFENSE ATTORNEY]: I understand, Your Honor. We would assert that these would be statements against interest by those individuals and go to the defendant's theory of the case.
 [COURT]: Thank you. You may proceed.
 Q. Sir, go ahead and tell me about what took place between Dustin and [the individual].
 A. Okay. It was one night we was all sitting there, and [the individual] owed him some money, and he said hold on just a minute, I'll go get some money. So he went and got some money and come back and he gave him the money, and we were sitting around there another hour or two and we got to looking at the money. It was a lot of old money. And so Dustin looked at me and said, man, I think this is the money that, you know, my momma puts back every now and then back in the basement, you know. And we got to looking at it and sure enough, you know, he thought it was the money that had been coming up missing, you know.
 Q. Did you go down to the basement room?
 A. Um-hmm. I've been down —
 Q. Did you go down with Dustin?
 A. Um-hmm.
 Q. Did Dustin know how to get into it?
 A. Um-hmm. Yeah. All you do is go downstairs.
 Q. Okay. Did he open it with a key?
 A. Yeah. No, it wasn't locked.
 Q. It wasn't locked?
 A. Unh-unh.
 Q. Okay. And what happened then? *Page 293 
 A. We went back up there and they got into it, you know, and that was all it was, you know. He confessed that he got the money.
 Q. [The individual] did?
 A. Yeah. And that's when he made him move. You know, I'm not lying. You know, I'm just, you know, here to tell the truth. That's what you want, ain't it? You know.
 * * * *
 Q. So according to your knowledge then, it was [the individual] who stole some money —
 A. Yeah.
 Q. — from that home?
 A. Yeah. And —
 Q. And Dustin kicked him out after that?
 A. Yes, sir.
 ¶ 29. Rule 9.04 of the Uniform Rules of Circuit and County Court dictates the procedure for the untimely presentation of witnesses by both the State and the defense. According to that rule, once the State objected to the introduction of Allen's testimony, the court should have granted the State "a reasonable opportunity to interview the newly discovered witness. . ." URCCC 9.04(I)(1). If, after interviewing Allen, the State claimed "unfair surprise or undue prejudice and [sought] a continuance or mistrial, the court [should have] . . . excluded] the evidence or grant[ed] a continuance for a period of time reasonably necessary for the [State] to meet the non-disclosed evidence or grant[ed] a mistrial." URCCC 9.04(I)(2).
 ¶ 30. Clearly, the above procedure was not followed in this case. The court never required the State to interview Allen, and the State did not interview Allen and then claim unfair surprise or undue prejudice. However, we find that omission to be of little consequence. Under the circumstances of this case, specifically that Allen's identity and story were disclosed late on the second day of trial, it is certain that the State would have claimed unfair surprise and undue prejudice after interviewing Allen. The nature of Allen's proffered testimony was such that an interview held in the middle of trial would have likely been inadequate to allow the State to prepare for Allen's testimony.
 ¶ 31. More problematic is the impact of the compulsory process clause of the Sixth Amendment on this case. According to the Mississippi Supreme Court, even if the procedure set out in Rule 9.04 is followed, "the circuit court cannot exclude theevidence." Morris v. State, 927 So.2d 744, 747 (¶ 8) (Miss. 2006) (citing Carraway v. State, 562 So.2d 1199,1203 (Miss. 1990)). According to our jurisprudence, Allen's testimony could only have been excluded "if the circuit court determined] that the `defendant's discovery violation [was] "willful and motivated by a desire to obtain a tactical advantage. . . ."'" Id. at 747 (¶ 9) (quotingCarraway, 562 So.2d at 1203, citing Taylor v.Illinois, 484 U.S. 400, 415, 108 S.Ct. 646, 98 L.Ed.2d 798
(1988)).
 ¶ 32. Here, there is no evidence whatsoever that the discovery violation was willful or motivated by a desire to obtain an unfair advantage over the State. Instead, the record reveals that defense counsel only learned of Allen's existence shortly before it was disclosed to the court. Therefore, Allen's testimony should not have been excluded, regardless of the discovery violation. Allen's testimony, as noted by the court, would have been important to Sandefer's case. Under these circumstances, we must reverse and remand for a new trial consistent with our holding here. *Page 294 
4. Refusal to Allow Use of Juvenile Convictions
 ¶ 33. This contention involves the court's refusal to allow Sandefer to use Gillespie's juvenile record for impeachment purposes. Rule 609(d) of the Mississippi Rules of Evidence governs when juvenile adjudications may be used to impeach a witness:
 Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if the conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.
We review the court's decision under an abuse of discretion standard. Tate v. State, 912 So.2d 919, 924 (¶ 9) (Miss. 2005).
 ¶ 34. Before reviewing Gillespie's sealed juvenile record, the court held that Gillespie's juvenile conviction would be inadmissible:
 I'm going to err on the side of being cautious, because the general policy behind not allowing introduction of juvenile adjudications for impeachment purposes has been or is that juveniles should not be burdened with those youthful mistakes. . . . In this instance I have no proof that it is the type of crimen falsi case that would be permissible if — and be admitted if Gillespie were an adult. . . .
 ¶ 35. The court later reviewed Gillespie's sealed juvenile records in camera, and determined that an adjudication of delinquency on the petition, as originally brought against Gillespie, would have been admissible. The court found, however, that the charges against Gillespie were reduced to crimes that would not be admissible for impeachment purposes if committed by an adult. After having reviewed the sealed juvenile records submitted to this Court, we find that the trial court did not abuse its discretion in making this determination. Therefore, the court did not err in refusing to allow admission of the conviction for impeachment purposes. This issue is without merit.
5. Denial of Mistrial
 ¶ 36. In reviewing whether a trial court erred in refusing to grant a mistrial, we look to see whether the court abused its discretion in denying the motion for a mistrial. Sipp v.State, 936 So.2d 326, 331 (¶ 7) (Miss. 2006). "The trial court must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case; however, the trial judge is permitted considerable discretion in determining whether a mistrial is warranted since the judge is best positioned for measuring the prejudicial effect." Id. (citing Tate,912 So.2d at 932 (¶ 41)). Sandefer contends that the court erred in refusing to grant a mistrial after two separate incidents: (1) after Gillespie testified that he and Sandefer had been involved in other misconduct, and (2) after West testified that Sandefer told him he went back to Taylor's home later and removed other objects from the safe room.
 ¶ 37. As to Gillespie's statement, the defense objected to the testimony, whereupon the court sustained the objection and instructed the jury to disregard Gillespie's remark. "[T]he law presumes the jury is competent and follows the instructions they are given." Curry v. State, 939 So.2d 785, 790 (¶ 17) (Miss. 2006) (citing Shoemaker v. State,502 So.2d 1193, 1195 (Miss. 1987)). Therefore, we find that the court did not abuse its *Page 295 
discretion in refusing to grant a mistrial because of Gillespie's remarks about "other misconduct."
 ¶ 38. Regarding the second incident, West testified that Sandefer told him that he had gone back later to take more items from Dr. Taylor's home:
 A. All right. And then this is after Memphis in May. He told me later on he went in the house and he got something else out of there.
 [DEFENSE COUNSEL]: Objection, Your Honor. It's outside of the indictment. It's other acts.
 [PROSECUTOR]: He hasn't testified as to when it happened, and there's been no proof that all of this was taken at once or — it's alleged over a month's period of time, Your Honor.
 [DEFENSE COUNSEL]: Could we bench on this, Your Honor, if —
 [THE COURT]: It will be overruled. I'm looking at the indictment. You may proceed with your line of questioning.
 A. Yeah. He — he told me that he had got a safe out of there later on. . . .
Sandefer believes that this was improper as West referenced bad acts outside the time period given in the indictment. We note that it is not clear from what West said that he was referring to an act committed outside the time frame of the indictment. Instead, West could have meant that Sandefer later told him that he had gone back to the house. It is not clear from West's testimony exactly when Sandefer was supposed to have returned to the house to take more items. Given the discretion afforded trial courts in determining when to grant a motion for a mistrial, we find that the court did not err in refusing to grant a mistrial as a result of these comments. This contention of error is without merit.
6. Sufficiency of the Evidence
 ¶ 39. The evidence sustaining a conviction is sufficient so long as "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."Mingo, 944 So.2d at 33 (¶ 56) (citing Bush v.State, 895 So.2d 836, 843 (¶ 16) (2005)).
 ¶ 40. Here, there was evidence that Dr. Taylor possessed around $6,000 in pre-1959 currency that was stolen. Within two weeks of the last time Dr. Taylor saw the money, Sandefer was observed at Dixon's spending strange looking twenty-dollar bills, all of which were printed prior to 1959. West, who was with Sandefer at Dixon's, testified that Sandefer told him that he had gotten the money from Dr. Taylor's home. Gillespie testified that he observed Sandefer with a large quantity of cash that "didn't look real" and that Sandefer told him that the money was "old money" that he had gotten from Dr. Taylor's home. Although Sandefer testified that he had gotten a quantity of old bills from the sale of some stereo equipment, the testimony of other witnesses indicated that the quantity of money that Sandefer was observed with was far greater than the amount he would have gotten from the alleged sale.
 ¶ 41. Given all the evidence in this case, both circumstantial and direct,[5] a *Page 296 
reasonable jury could have found all the elements of the crime of burglary beyond a reasonable doubt. Therefore, the evidence is sufficient to sustain Sandefer's conviction, and this contention is without merit.
7. Cumulative Error
 ¶ 42. Because we have found reversible error and are remanding this case for a new trial, we find this issue to be moot.
 ¶ 43. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTYOF CONVICTION OF BURGLARY AND SENTENCE OF TWENTY-FIVE YEARS INTHE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ISREVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THISOPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.
LEE, P.J., ISHEE AND CARLTON, JJ., CONCUR. GRIFFIS AND BARNES, JJ., CONCUR IN RESULT ONLY. KING, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION. MYERS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CHANDLER AND ROBERTS, JJ., NOT PARTICIPATING.
[1] We note that our interpretation is supported by case law from other jurisdictions. See People v.Sparks, 28 Cal.4th 71, 120 Cal. Rptr.2d 508, 47 P.3d 289
(2002) (affirming burglary conviction where defendant entered a home with the victim's consent but then proceeded to rape her in her bedroom. The California statute in question indicated that a burglary could be committed by entering any house or room);State v. Curtis, 144 Wis.2d 691, 424 N.W.2d 719
(Ct.App. 1988) (affirming burglary conviction where defendant entered victim's bedroom, regardless of the fact that defendant lived in the same home as the victim. The Wisconsin statute indicated that a burglary could be committed by entering any building or any room within the building).
[2] The record reflects that prior to trial defense counsel had tendered to the State a witness list containing six to twelve witnesses.
[3] The record reflects that it was only three witnesses and that none of them were ever offered by Sandefer during his defense. Why they were not offered is not clear from the record, although it is clear that the trial court never ruled on whether they would be allowed to testify if offered.
[4] Tracy identified the individual by name. However, due to the nature of the unproved charges leveled against this individual, we have chosen to delete the name.
[5] Sandefer contends that the court erred in refusing his proposed jury instruction D-4, a circumstantial evidence instruction. Sandefer contends that this case was circumstantial because West and Gillespie were able to testify only that Sandefer said he had taken the money, not that he had unlawfully taken it from Dr. Taylor's home. We find that West and Gillespie testified directly that Sandefer had told them that he had taken the money from Dr. Taylor's home. Therefore, under the circumstances of this case, a circumstantial evidence instruction would have been improper.