# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01157-COA

**JARVIS JONES** APPELLANT

**v.**

**STATE OF MISSISSIPPI** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/02/2023 |
| TRIAL JUDGE: | HON. KENT E. SMITH |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ANNA KATHERINE ROBBINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/20/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., LAWRENCE AND ST. PÉ, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Jarvis Jones was convicted of armed robbery by a Union County Circuit Court jury. The court sentenced him to forty years in the custody of the Mississippi Department of Corrections (MDOC), with twenty-three years suspended and seventeen years to serve, followed by five years of post-release supervision. On appeal, Jones argues that evidence of prior convictions of the prosecution's witness should have been admitted at trial. He also argues that the trial court erred by allowing the prosecutor's comments concerning his silence after being read his *Miranda* rights.[1] Following review, we affirm.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**FACTUAL AND PROCEDURAL HISTORY**

¶2.     On June 10, 2021, Dakota Jackson and his fiancée Brittnay Campbell were robbed at gunpoint in their home.  Following an investigation, on October 5, 2021, a Union County grand jury indicted Jarvis Jones and Duwayne Holloway for robbery with a deadly weapon. On December 28, 2021, counsel for Jones filed a motion for production, discovery, and other related relief on behalf of Jones, Holloway, and approximately fifty other clients in unrelated cases.  On July 21, 2023, Jones filed a motion for a continuance of his trial, which had been scheduled for July 25, 2023.  That motion was denied.  On that same date, Jones also filed a motion to sever his and Holloway's cases.  On July 24, 2023, the trial court granted the motion and severed the cases.  On July 25, 2023, the State filed a motion to prohibit Jones from including a discussion of his potential sentence while at trial.  The State also filed a motion in "anticipat[ion] the State and [Jones] will discuss (or have discussed) a potential guilty plea" to exclude from trial "any evidence – testimonial or otherwise – and any argument of plea discussions between the State and [Jones]."[2] The court addressed the motions at a pre-trial hearing, holding that a discussion of either was not relevant and would not be permitted at trial.

¶3.     Pertinent to the issues before us on appeal, on July 10, 2023, the State filed a motion in limine to prevent the introduction of character evidence through impeachment under Rule 609(a)(2) of the Mississippi Rules of Evidence.  Specifically, the State intended to call Sammie Joe Poole as a witness and was aware of three convictions on her record, two of

---

[2] This motion did not reference any subject matter discussed and appeared to only concern Jones.

which were burglary, and the other of which was child endangerment.[3] On July 24, 2023, the court granted this motion, stating that Poole's "convictions were not crimes of dishonesty or falsehood and, therefore, she would not be able to be impeached with those prior convictions." The court then ordered Jones to not make "reference to or discuss in any manner the prior misdemeanor and felony convictions" of Poole. There is nothing in the record indicating Jones made any objection to this motion or ruling.

¶4. Jones's trial took place on July 25-27, 2023. The State's first witness was Officer Brian Carpenter from the Union County Sheriff's Department. On June 11, 2021, Officer Carpenter followed up on a report of a robbery that had occurred the previous night at an address in Union County. He took statements from the home's residents and victims of the robbery, Dakota Jackson and Brittnay Campbell. This led to Carpenter receiving the name of Sammie Joe Poole, who had given Jones a ride later in the evening. Carpenter interviewed Poole, who told him that Jones had been "bragging about hitting a lick to her." She also told him that she witnessed Jones and "the black man with the bad eye[,]" later identified as Holloway, "separating cash, marijuana" and "saw a black AR-15 . . . on the table." Carpenter interviewed Jones "[o]n June 21st[,]" about a week after interviewing Poole. Carpenter had received two search warrants for phones in Jones's possession but was unable to search them because they had "pass codes on them," and Jones "wouldn't cooperate" by giving the pass codes to him. Jones also "didn't sign his rights waiver . . . nor gave a statement." There was no objection to this question or the introduction of the signed waiver into evidence by the

---

[3] The record and briefs filed with this Court contain various spellings of Poole's name. She was a witness for the State, so we will use its spelling.

3

defense.

¶5.    The State then called Dakota Jackson as a witness.  At the time of the incident, Jackson was living at the Union County home with Brittnay Campbell, his fiancée, and three step-children.  Jackson stated that he "had known [Jones] for while" and that they had "hung out" previously.  He also recalled that Jones went by the nickname "Jay."  On the day before the incident, Jackson saw Jones who "had got out of jail and didn't have any money, or anything like that[.]"  Jackson "gave him $200 just to make sure . . . he could eat, or whatever."  On June 10, 2021, Jackson arrived home from work and was "cooking dinner" and "drinking some" with Campbell.  At some point, Jones arrived with a man named "Young Money," who he claimed was his cousin.  Jackson later identified him as DuWayne Holloway.  Jackson, Campbell, Jones, and Holloway spent "four to five hours" together "smoking and drinking . . . [and] just listening to music[.]"  Jackson stated that Holloway's pregnant "baby momma" was outside and not feeling well.  She did not enter the home at all, and Jackson never interacted with her.

¶6.    Jackson continued his testimony, stating that Holloway "had walked out" of the residence, "on the porch," and Jackson turned his back to the door.  At some point, Holloway and another man "busted in" the home.  Jackson noticed Campbell "going kind of fast toward the backdoor."  Suddenly, Holloway "put a gun to [his] head" and instructed him not to "make a fuss, or fight, nothing like that."  Jackson "freaked out" and "just grabbed the gun and moved it from [his] head."  Jackson testified that the gun was a pistol.  Jackson turned around and saw the unidentified third man "with a AK, or a Draco" who pointed it toward

4

him, "either racked it or took the safety off[,]" and told him "not to move" or the man would shoot him. While these events were occurring, Jones "was just kind of over in the corner" and "didn't seem scared or nothing like that." Jackson also noted that neither of the men pointed their guns at Jones.

¶7.	Jackson testified that the thieves stole an "AR-15, a Smith and Wesson airweight .38 special[,]" approximately "$3,900 in cash and two cell phones" belonging to him and Campbell. Jackson had just received his tax return and cashed it, getting "$9,000 all together." He had paid some of his and Campbell's bills, and the $3,900 was the remaining amount. He testified that he had the cash out at the time of the crime because he was going to "purchase some weed" from Holloway. Jackson also noted that he never saw the two men steal anything from Jones, but Jones "played like he got robbed too."

¶8.	"[W]hen everything was over," Jackson heard Jones say, "[H]ey, brother," and walk "out the door with his hands in his pockets." Jones then came back into the residence and stated, "[T]hey just robbed me[.]" Holloway and the other suspect "took off . . . in a white car." Jackson and Campbell then gave Jones a ride to Stokes Supermarket to meet Sammie Joe Poole. Jackson dropped off Jones and stated he never heard from or saw him again. Jackson also testified that after the robbery, Jones claimed he did not know either of the assailants.

¶9.	The State also called Brittnay Campbell to testify. She stated that on the day of the robbery, she was at home with Jackson, along with Jones and Holloway, who were over for "[s]everal hours." Campbell did not know Holloway and had only met Jones "a couple of

5

times." Campbell noticed Holloway "going in and out" of the house because "his girlfriend was in the car . . . pregnant and she didn't feel good." Neither she nor Jackson thought "much of it" at the time. While Campbell was cooking dinner, she heard Jackson "holler, 'what the hell,' or something." As she "started to go into the living room . . . [Jones] pushed [her] back into the kitchen" and told her "not to come in there at that moment." She noted that Jones's demeanor was "[f]ine" and that he was "[j]ust standing there." Campbell observed a man she did not recognize "in the living room with a gun to [Jackson's] head" and another man with a gun.

¶10. Campbell "ran out the back door . . . to [her] sister's house" nearby to "try to call the cops." It was then that "whoever the third person was and [Holloway] and whoever was in the car" outside her home "flew up the driveway." She threw a "grill lid" at the car to attempt to stop them but only hit the windshield. Campbell went back to her residence and got into her truck with Jackson and Jones. Jones "said he knew where" the assailants would be heading and that they "were going to find them." He had also used Campbell's phone "to call someone to come pick him up" at Stokes Supermarket. That person was Sammie Joe Poole. Campbell and Jackson dropped Jones off with Poole and planned to follow them to the gas station. However, Jones and Poole did not follow them, and "that's when [they] started putting two and two together[, t]hat [Jones] probably had a part in it." Campbell stated that while she never saw Jones with a phone, she also never saw anything taken from him. Campbell "went to the police department that night" and to look at the crime scene the following day. She testified that the items stolen from her home were Jackson's "iPhone 11,

6

[her] iPhone SE, an AR-15, a 15 Smith and Wesson .38 Special[,]" and cash in the amount of $3,960. She and Jackson never recovered any of the stolen items.

¶11. Finally, the State called Sammie Joe Poole to testify. At the time of the crime, Poole had known Jones for approximately "five or six years." That night, Poole got off work and saw a Facebook message from Jones "asking [her] to come get him" at Stokes Supermarket. Screenshots of the conversation were entered into evidence, and the State noted that Jones had "unsent" two messages. Poole testified that both deleted messages were Jones asking her to pick him up at Stokes Supermarket. At approximately 12:00 a.m., Poole picked up Jones. Jones had arrived first with "a white girl and a white guy[,]" whom Poole did not know. Once Jones was in Poole's car, he stated, "[F]ollow them, but we're going to leave them." Jones then instructed Poole to "[t]ake him home," where he lived with his mother. During the trip, Jones informed Poole that "we hit a lick" but said nothing further. Poole arrived at Jones's home and saw a "black . . . thin" man with a "messed-up eye[,]" who was later identified as Holloway, already there. Poole went into the house and observed "some guns, on the table, and some weed and some money." Jones and Holloway were "counting the money and kind of like flashing it around." They both "kept saying we hit a lick." Poole stated that at this point, she "thought to [her]self, they done robbed somebody."

¶12. Poole and Jones took Holloway home before driving to a "hotel room in Holly Springs." Waiting for them there was a white man named Creed Shaklefield. All three of them went to a room for approximately twenty minutes and then left. They then left to go to "some house" in Red Banks "off some old country road[.]" Once they arrived, Jones

7

"tried to get [Poole] to go up there and act like - - obviously, somebody had a gun. And they wanted [Poole] to go up there to say the gun was [hers] to get it back." Poole refused because she "was on probation and . . . just do[es]n't deal with guns." At some point, she realized that she left her purse "in the car and they had robbed [her] for a hundred dollars." Poole's credit card was also missing. She testified that she then told the men she was "ready to go" and asked where they needed to be taken. Poole dropped off Shaklefield "at Watson somewhere" and "took Mr. Jones to his baby mama['s] house in Potts Camp." She dropped off Jones at "6:00 or 7:00 that [next] morning[,]" approximately five to six hours after picking him up at Stokes Supermarket. Poole then went to her home. At approximately 6:58 p.m. that same day, Officer Carpenter went to Poole's home and found her sleeping in her car, intoxicated. He took her to jail, where she spent the night before giving a statement the next morning.

¶13. The State rested following Poole's testimony, and Jones moved for a directed verdict. That motion was denied. After being reminded of his rights, Jones indicated that he was going to testify in his own defense. Jones stated that on June 10, 2021, he "was robbed." Holloway "had hit [him] up" and "wanted some grass." Jones clarified that "grass" was another word for marijuana. Jones stated that he "knew where something was" and decided to "go to [Jackson] and get it for cheap." Specifically, Jones testified he intended to "get it cheaper from Dakota Jackson and sell it to [Holloway] for higher." Jones gave him Jackson's address and stated Holloway "and them was supposed to wait at the road" while Jones went into the home to get the marijuana and "bring it [out] to them." Holloway

8

"wanted to check the [marijuana] out" himself.

¶14. Jones and Holloway entered Jackson's home and began "talking about the weed." They stayed to talk and drink for "a couple of hours[.]" Jones noted that Holloway was "steadily in and out" the door of the home to allegedly speak to "his baby mama" waiting in the car outside. The car's windows were tinted, so Jones could not confirm the identity of this person. Later that evening, Jackson showed Holloway "all kind of stuff through the house, like guns and all this[,]" and began showing Jones "how to break down his gun." Jones stated that both he and Jackson were in the floor when the "door came open . . . [, and] they bust[ed] in" to the home. He identified one of the men as Holloway but claimed he did not know the other. He continued, "They put the guns on us and stuff like that." Jones saw Campbell "come from the kitchen" and "told her to get out of here[.]"

¶15. Jones stated that his phone, money, and Jackson's "stuff" were all stolen. He "ran behind" Holloway and asked, "[Y]ou really going to do me like this[?]" Jones then "went next door to [Jackson's] people house," where he "used the phone to get [Poole] to come pick [him] up." Poole picked him up, and Jones told her they had been robbed and listed "everything that was taken." Jones stated he and Poole "went through a road block" before she dropped him off at his home. That was the last time he saw her that night. He also testified that Holloway was not his cousin, and he did not know anyone named Creed. Jones further testified that Holloway did not point a gun at him; rather, the unidentified man did it. Jones stated that he was picked up by the police on June 11, 2023, and "wrote a whole statement." He alleged that Officer Carpenter was "keeping something out." The defense

9

rested following Jones's testimony.

¶16.    After resting, the defense renewed its motion for a directed verdict.  The court denied this motion.  Following a conference regarding jury instructions, both sides gave their closing arguments.  Notably, during the State's rebuttal, the following statements were made:

> So, 11 days later, when [Officer] Brian Carpenter brings him [] into the police station to give a statement, he won't even sign the Miranda form. He writes zero words on his statement. Wouldn't, if you were the victim of a crime, say, hey. Hey, I was robbed. Wouldn't you say that? He says he doesn't want to be a snitch. But, then on the other hand, he says, but I did write a statement. Of course, we don't have that statement, because it doesn't exist. If that made sense, he's saying I didn't want to be a snitch, but then I snitched on him because I made a statement. That makes no sense. Always an excuse for something. He's talking out of both sides of his mouth.

Jones did not make any objections during the State's closing argument.

¶17.    At the conclusion of the trial, the jury found Jones guilty of armed robbery.  On July 27, 2023, the court held a sentencing hearing for Jones.  Jones was sentenced to forty years in the custody of the MDOC, with twenty-three years suspended and seventeen years to serve, followed by five years of post-release supervision. Jones filed a motion for a judgment of acquittal notwithstanding the verdict and a motion for a new trial.  Both motions were denied.  On October 13, 2023, Jones appealed.[4]

## STANDARD OF REVIEW

¶18.    "Our standard o[f] review regarding the admission of evidence is abuse of discretion, and we will not reverse the trial court's evidentiary ruling unless the error adversely affects

---

[4] On April 3, 2024, Jones filed a motion with this Court to supplement the record with the transcript of the pre-trial motions hearing held on July 24, 2023.  The motion additionally requested that the briefing schedule be suspended until the transcript was received by the Court.  On April 24, 2024, this Court granted the motion.

a substantial right of a party." *Sandefer v. State*, 952 So. 2d 281, 285 (¶9) (Miss. Ct. App. 2007) (quoting *Mingo v. State*, 944 So. 2d 18, 28 (¶27) (Miss. 2006)).

## ANALYSIS

¶19. On appeal, Jones argues that evidence of Poole's prior convictions should have been admissible and that the trial court erred by allowing comments concerning his silence after being read his *Miranda* rights.

### I. Admissibility of Poole's Prior Convictions

¶20. The State filed a motion in limine alleging that evidence of the State's witness Poole's prior convictions of burglary and child endangerment was impermissible at trial under Rule 609(a)(2). Rule 609 of the Mississippi Rules of Evidence provides in relevant part:

> The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:
> > (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:
> > > (A) must be admitted, subject to Rule 403, when the witness is not a party; and
> > > (B) must be admitted when the witness is a party, if the probative value of the evidence outweighs its prejudicial effect to that party; and
> > (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving–or the witness's admitting–a dishonest act or false statement.

MRE 609(a)(1)-(2). The trial court found that "Poole's prior misdemeanor and felony convictions [we]re not crimes involving dishonesty or false statements within the meaning of the Mississippi Rules of Evidence, as they [we]re not crimes in the nature of *crimen falsi,*

11

and the introduction would only tend to prejudice the jury."[5]  This result, however, only addressed Rule 609(a)(2); neither the motion nor the court's order addressed Rule 609(a)(1).

¶21.    The State concedes that Poole's prior felonies may have been admissible under Rule 609(a)(1).  We find the convictions were most likely admissible, as our appellate courts "interpret [Rule] 609(a)(1) as allowing full impeachment of prosecution witnesses without the requirement of a balancing test, except in extreme situations[.]"  *White v. State*, 785 So. 2d 1059, 1062 (¶10) (Miss. 2001). However, this argument was not properly preserved by Jones at trial; there is no indication in the record or the supplemental transcript that he ever made an objection to the State's motion.  Our state's precedent is clear that a defendant who does not make a contemporaneous objection at trial "must rely on **plain error** to raise the assignment on appeal."  *Cozart v. State*, 226 So. 3d 574, 581 (¶23) (Miss. 2017) (emphasis added) (quoting *Brown v. State*, 690 So. 2d 276, 297 (Miss. 1996)).

¶22.    "To determine if plain error has occurred, we must determine [(1)] if the trial court has deviated from a legal rule, [(2)] whether that error is plain, clear, or obvious, **and** [(3)] whether the error has prejudiced the outcome of the trial."  *Walker v. State*, 385 So. 3d 457, 465 (¶24) (Miss. Ct. App. 2023) (emphasis added) (quoting *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016)), *cert. denied*, 387 So. 3d 63 (Miss. 2024).  As stated, the State concedes there may have been a legal avenue for Poole's prior convictions to be admitted

---

[5]  The State is correct that burglary was not a crime involving a dishonest act or a false statement.  *See Townsend v. State*, 605 So. 2d 767, 770 (Miss. 1992) ("We hold, in accordance with the majority of federal courts, that a burglary conviction is not ordinarily admissible under M.R.E. 609(a)(2) and that convictions under that rule should be limited to crimes in the nature of *crimen falsi*." (citing *United States v. Ashley*, 569 F.2d 975 (5th Cir. 1978))).

into evidence via Rule 609(a)(1). Regardless of whether we were to find the error "obvious," we would also need to find Jones's trial was prejudiced by the exclusion. "[P]rejudice will not be found when the State presents an overwhelming amount of evidence against the accused." *McLaughlin v. State*, 338 So. 3d 705, 725 (¶56) (Miss. Ct. App. 2022) (citing *Swinney v. State*, 241 So. 3d 599, 606 (¶15) (Miss. 2018)). Indeed, "prejudice often is lacking when the weight of the evidence against a defendant is overwhelming[.]" *Id.* (quoting *Stevenson v. State*, 320 So. 3d 1225, 1230 (¶19) (Miss. 2021)); *see also Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016) (finding no plain error where "the weight of the evidence of [defendant]'s guilt was overwhelming," specifically citing that "[t]wo eyewitnesses testified that Hall was the [perpetrator]").

¶23.    Jackson and Campbell were eyewitnesses to the armed robbery, and both testified at trial. Jackson recounted for the jury that Jones brought Holloway, a man he claimed to be his cousin, into the couple's home. He stated that Holloway kept walking in and out of the door throughout the night to speak with someone outside waiting in the car. Jackson recalled that when the armed men came into his home, he was the only person on the ground and was the only person with a gun to his head. He testified that Jones did not have a weapon pointed at him and did not even really appear "scared" as the robbery occurred. Campbell testified that she witnessed Jackson having a gun pointed at his head, but she did not see Jones being threatened with a weapon at all. In fact, when the robbery began, Jones instructed Campbell to stay in the kitchen "at that moment," exhibiting a "fine" demeanor.

¶24.    Poole's testimony picked up where the robbery concluded. She was able to discuss

Jones's whereabouts the rest of the evening, which was in and of itself a lengthy and detailed portion of testimony. Jones contends that the "the State's case relied heavily on Poole's testimony," and without it, their case "was substantially weaker." Crucially, though, the jury still would have heard the entirety of Poole's testimony even if the evidence of her prior convictions were permitted. The evidence of those prior convictions would have been permitted only through impeachment during her cross-examination and only as a way to cast doubt upon her reliability as a witness. Poole admitted that she was "on probation" while testifying; therefore, the jury was aware that she had committed some kind of offense in the past. This Court finds the weight of the evidence of Jones's guilt "to be overwhelming" and, thus, finds no plain error in the exclusion of Poole's prior convictions. *Id.*

## II.     Prosecution's Comments

¶25.    Jones also argues that the trial court erred in allowing comments from the prosecution regarding his post-*Miranda* silence.

### A.     Procedural Bars

#### 1.     Direct-Examination

¶26.    First, Jones takes issue with questions asked by the State during its direct examination of Officer Carpenter. He specifically cites the following exchange:

> Q:     I'm going to show you a document, a couple of documents. Would you review those and tell the jury what they are[?]
>
> A:     That's the standard right[]s waiver that I always use at the sheriff's department.
> . . . .
>
> Q:     All right. And did Mr. Jones cooperate with that, signing it?

14

A:     He didn't sign his rights waiver, in either place, nor gave a statement.

. . . .

Q:     So, Officer Carpenter, at this point, you have attempted to question, mirandized and question Mr. Jones?

A:     Correct.

Q:     You get nothing out of that?

The State also introduced Jones's unsigned *Miranda* waiver form and blank accompanying statement. Neither the line of questioning nor the introduction of the waiver form were objected to at trial. And "failure to object contemporaneously at trial waives any claim of error on appeal." *Cox v. State*, 183 So. 3d 36, 55-56 (¶69) (Miss. 2015) (quoting *Gillett v. State*, 56 So. 3d 469, 520 (¶148) (Miss. 2010)); *see also Howell v. State*, 860 So. 2d 704, 756 (¶185) (Miss. 2003); *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995). Additionally, Jones "failed to timely request a mistrial or curative instruction" pertaining to this exchange, which serves as a procedural bar to the issue. *Smith v. State*, 90 So. 3d 122, 127 (¶15) (Miss. Ct. App. 2012) (citing *Randall v. State*, 806 So. 2d 185, 213 (¶69) (Miss. 2001); *Logan v. State*, 773 So. 2d 338, 349 (¶¶43-46) (Miss. 2000); *Collins v. State*, 81 So. 3d 1174, 1179 (¶13) (Miss. Ct. App. 2011)); *see also Parker v. State*, 20 So. 3d 702, 707-08 (¶23) (Miss. Ct. App. 2009).

### 2.     Closing Argument

¶27.     Jones further contends the State made improper comments during its closing argument before the jury, particularly:

When they're out looking for him and he finally gets brought in for a statement, why didn't he say, wait, no. No, I'm a victim too. I was robbed too.

15

. . . .

> So, 11 days later, when [Officer] Brian Carpenter **brings him [] into the police station to give a statement, he won't even sign the Miranda form. He writes zero words on his statement.** Wouldn't, if you were the victim of a crime, say, hey. Hey, I was robbed. Wouldn't you say that?

(Emphasis added). Jones did not make any objections during the State's closing argument. Again, "failure to object contemporaneously at trial waives any claim of error on appeal." *Cox*, 183 So. 3d at 55-56 (¶69) (quoting *Gillett*, 56 So. 3d at 520 (¶148)); *see also Howell*, 860 So. 2d at 756 (¶185); *Walker*, 671 So. 2d at 597. And additionally, Jones "failed to timely request a mistrial or curative instruction." *Smith*, 90 So. 3d at 127 (¶15) (citing *Randall*, 806 So. 2d at 213 (¶69); *Logan*, 773 So. 2d at 349 (¶¶43-46); *Collins*, 81 So. 3d at 1179 (¶13)); *see also Parker*, 20 So. 3d at 707-08 (¶23). Such failure serves as "a procedural bar to our review of the issue." *Id.*

### B.     Plain Error

¶28.    As Jones is procedurally barred from this argument as to both alleged errors, he "**must rely on plain error** to raise the assignment on appeal." *Hurt v. State*, 34 So. 3d 1191, 1195-96 (¶12) (Miss. Ct. App. 2009) (emphasis added) (finding "[w]here it was alleged that the prosecutor made improper comments during both opening and closing arguments as well as while examining witnesses, but no objections were raised at trial, the defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal" (quoting *Jackson v. State*, 924 So. 2d 531, 542 (¶35) (Miss. Ct. App. 2005))).

¶29.    As with our prior plain-error analysis, "we must determine [(1)] if the trial court has deviated from a legal rule, [(2)] whether that error is plain, clear, or obvious, **and** [(3)]

whether the error has prejudiced the outcome of the trial." *Walker*, 385 So. 3d at 465 (¶24) (emphasis added) (quoting *Green*, 183 So. 3d at 31 (¶6)). The United States Constitution indeed guarantees "[a]n accused . . . the right to remain silent." *Swinney*, 241 So. 3d at 608 (¶29) (quoting *Austin v. State*, 384 So. 2d 600, 601 (Miss. 1980)). "Evidence of post-arrest silence is improper because it violates the accused's right against self-incrimination." *Swinney*, 241 So. 3d at 608 (¶29) (quoting *Austin*, 384 So. 2d at 601). As such, "[i]t is improper and, ordinarily, reversible error to comment on the accused's post-*Miranda* silence." *Id.* (quoting *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990)).

¶30. To decide whether a deviation from this legal rule occurred, "[t]he proper test for determining if a comment on a defendant's post-*Miranda* silence amounts to reversible error is whether the natural and probable effect of the statement is to create an unjust prejudice against the accused **resulting in a decision influenced by prejudice**." *Smith v. State*, 90 So. 3d 122, 127 (¶12) (Miss. Ct. App. 2012) (emphasis added) (quoting *Gunn v. State*, 56 So. 3d 568, 571 (¶14) (Miss. 2011)). Further, "the mere mention of a defendant's refusal to give a statement does not, in all instances, require reversal." *Id.* (citing *Gossett v. State*, 660 So. 2d 1285, 1291 (Miss. 1995)). It appears that the State did indeed violate a known rule in commenting on Jones's post-trial silence, which Jones had a right to invoke.

¶31. "Even when a prosecutor has made an impermissible comment, this Court requires a showing of prejudice to warrant reversal." *Johnson v. State*, 311 So. 3d 1161, 1178 (¶36) (Miss. Ct. App. 2020) (emphasis omitted) (quoting *Outerbridge v. State*, 947 So. 2d 279, 286 (¶23) (Miss. 2006)). This Court has "held that a defendant could not be prejudiced by

unnecessary and inappropriate prosecutor statements when the evidence presented was insurmountable." *Walker*, 385 So. 3d at 465 (¶24) (quoting *Green*, 183 So. 3d at 31 (¶6)). This brings us back to our previous recounting of the evidence presented against Jones, *see supra* ¶¶23-24. Jackson and Campbell presented eyewitness testimony of the robbery itself, emphasizing that Jones was not physically threatened whatsoever. Additionally, Poole was able to provide details as to Jones's whereabouts following the robbery and divulged that he was "bragging" that he had "hit a lick" that night. She also provided testimony that she witnessed Jones and Holloway dividing cash and marijuana between themselves, as well as noticing a black AR-15—resembling the weapon stolen in the robbery—nearby. We simply cannot find Jones was prejudiced when such "insurmountable" evidence was presented against him. *Johnson*, 311 So. 3d at 1177-78 (¶36) (quoting *Ambrose v. State*, 254 So. 3d 77, 129 (¶161) (Miss. 2018)). Even with his own testimony to counter the State's evidence, the jury clearly did not believe Jones's account of the events. Accordingly, there is no plain error evident in the State's comments on Jones's silence.

## CONCLUSION

¶32. Jones failed to make contemporaneous objections at trial on the record regarding his two issues on appeal. This Court, after conducting a plain-error analysis, finds Jones's arguments are not persuasive. We affirm Jones's conviction and sentence.

¶33. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**