# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CT-01158-SCT

*MARVIN "BUTCH" LOGAN a/k/a MARVIN O. LOGAN*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/1996 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ALBERT LIONEL NECAISE |
| | WILLIAM ROSS CAPPS |
| | ROBERT WARREN MOAK |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | DUNN LAMPTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/21/2000 |
| MOTION FOR REHEARING FILED: | 5/30/2000 |
| MANDATE ISSUED: | 12/28/2000 |

**EN BANC.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

### INTRODUCTION

¶1. The motion for rehearing is denied. The original opinion is withdrawn, and this opinion is substituted therefor.

¶2. Marvin "Butch" Logan was convicted in the Lincoln County Circuit Court of seven counts of defrauding the Mississippi Department of Public Safety and the Mississippi Tax Commission, under Miss. Code Ann. § 97-7-10 (1994), and five counts of uttering forgery, under Miss. Code Ann. § 97-21-59 (1994). The Court of Appeals reversed and remanded for a new trial. This Court granted certiorari to address evidentiary issues regarding consent searches, business records, and expert testimony.

### FACTS AND PROCEEDINGS BELOW

¶3. Marvin Logan, an oil field service worker by trade, also operated a business rebuilding salvaged

Chevrolet and GMC pick-up trucks in his spare time. The business consisted of a small mechanic's shop located behind his residence in Brookhaven, Mississippi. Logan purchased numerous trucks at salvage auctions conducted statewide by different insurance companies. Over several years, Logan rebuilt over seventy vehicles.

¶4. After Logan rebuilt a wrecked truck, he was required by Miss. Code Ann. § 63-21-15 (5) (Supp. 1999) to have it inspected by the State Highway Patrol so that a salvage certificate of title could be requested. After the inspection approval, per Miss. Code Ann. § 63-21-39 (1996), the application for title was made to the Mississippi State Tax Commission who in turn issued a salvage certificate of title.

¶5. Several other individuals also used Logan's shop to rebuild vehicles. In October of 1995, Johnny Joe Gunnell, an individual who used Logan's shop, was stopped by the Brookhaven police for a traffic violation. Gunnell was driving a stolen vehicle. Several more vehicles at Gunnell's house were found to be stolen, and Gunnell directed authorities to Logan and his repair shop. Investigating officers made three visits to the Logan work shop which visits are the subject of the first assignment of error and will be detailed in that discussion. The third of these inspections occurred on February 14, 1996, when the police executed a search warrant on Logan's residence. Upon searching his residence, the police seized four boxes of files containing documents which were organized into separate folders for the various vehicles that Logan had rebuilt over the years. On April 17, 1996, Logan was indicted by the Lincoln County grand jury on seven counts of defrauding the Mississippi Department of Public Safety and the Mississippi Tax Commission, and six counts of uttering forgery to the Mississippi Department of Public Safety when he submitted documents to that Department for retitling seven automobiles that he had rebuilt.

¶6. On July 19, 1996, Logan filed a combined motion to suppress the evidence challenging the searches of his home and shop and the requirement by the Highway Patrol that he bring them all vehicles in his possession that he had rebuilt. At a hearing on July 19, 1996, the circuit court denied the motion to suppress.

¶7. At trial, the jury found Logan guilty of twelve of the thirteen counts in the indictment. He was subsequently sentenced to three years on each count to run consecutively, with the sentences in the last five counts to run concurrent to the sentences in the first five counts. He was also fined $28,000 and ordered to pay restitution in the amount of $37,500. On October 9, 1996, Logan filed a motion for a new trial which the trial court denied. Being aggrieved, Logan perfected an appeal, which was assigned to the Mississippi Court of Appeals.

¶8. Upon review of the decision reached in the trial court, the Court of Appeals, in a split decision, reversed and remanded for a new trial. *Logan v. State*, No. 96-KA-01158-COA (Miss. Ct. App. Apr. 20, 1999). A majority of the Court of Appeals found, among other things, that:

(1) There was no valid consent to the initial warrantless searches of Logan's business and property;

(2) An investigator was improperly allowed to authenticate documents from individual insurance companies;

(3) An investigator was improperly allowed to testify concerning car repairs and metallurgy without being qualified as an expert in either field, and;

(4) The prosecutor made improper comments during closing arguments which prejudiced the jury.

¶9. Four members of the Court of Appeals concurred in part and dissented in part, agreeing with a reversal and remand for new trial but concluding that the evidence gathered in the searches of Logan's premises was admissible.

¶10. Aggrieved by the judgment of the Court of Appeals, the State filed its petition for a writ of certiorari, which was granted by this Court. An amicus curiae brief was received from the National Insurance Crime Bureau (NICB) on certiorari.

## ISSUES

### I. Did the trial court err in allowing the introduction of evidence

### seized during searches of Logan's home and shop?

¶11. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search." Miss. Const. art. 3, § 23 (1890).

¶12. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the United States Supreme Court held that when determining whether consent to a warrantless search was given voluntarily, the totality of the circumstances must be examined. In *Jackson v. State*, 418 So.2d 827, 830 (Miss. 1982), this Court adopted that federal standard. "As a consequence of adopting the voluntariness test for consent searches, the [United States Supreme] Court concluded that 'while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.' That is, consent may be established without a showing that the police warned the consenting party of his Fourth Amendment rights or that he was otherwise aware of those rights." *Jones v. State ex rel. Miss. Dep't of Pub. Safety*, 607 So.2d 23, 27 (Miss. 1991) (citing *Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059, 36 L.Ed.2d at 875); *see also Graves v. State*, 708 So.2d 858, 863-64 (Miss. 1997).

¶13. Logan claims that the first search, in which investigating officers only conducted a visual inspection of Logan's shop and did not seize any evidence, was an unconstitutional search in that it was not undertaken with the informed consent of the property owner and was not authorized by a valid search warrant. Logan urges that his wife's decision to permit the inspection was not voluntary since she was both uninformed as to her right to refuse and intimidated by the presence of a large number of law enforcement officials who had arrived unannounced and *en masse*. At trial, there was a lengthy inquiry into the circumstances that led Mrs. Logan to permit the officers to walk through the shop, and there is no contention that she lacked authority to consent to the inspection. The trial court did not find that Mrs. Logan was so intimidated by the presence of these officers that she felt coerced or forced to permit the inspection against her will. In ruling on such subjective matters, the trial judge is given wide discretion. *Luton v. State*, 287 So.2d 269, 272 (Miss.1973). He observes the witnesses first hand, hears the evidence and then determines whether the consent was, in fact, voluntary or not. *Id.* When his ruling is contested on appeal, an appellate court may set aside that ruling only if that court is satisfied that the trial court was manifestly wrong in so deciding. *White v. State*, 495 So.2d 1346, 1347 (Miss.1986). This Court finds no manifest error in the trial court's ruling.

¶14. One of Logan's arguments rests on the proposition that Mrs. Logan was not affirmatively informed by

the officers of her right to decline the inspection of the premises. When the issue is the voluntariness of a consent to search, there is no absolute requirement that the person receive a *Miranda*-like notification that the person can refuse the officer's request, even though this Court has suggested that it will, using state constitutional concerns, apply a stricter test of voluntariness than the United States Supreme Court does under Fourth Amendment jurisprudence. *Penick v. State*, 440 So.2d 547 (Miss.1983). According to the *Penick* decision, there must be a dual determination of consent to search accompanied by a showing that the consent was knowledgeable. *Id.* at 550.

¶15. In this case, after Mrs. Logan was requested to consent to an inspection of her husband's shop, she declined to do so unless the officers agreed to remove a substantial number of the police cars parked at her residence. The very act of attaching conditions to the consent to search and demanding compliance with the conditions before the search began appears a strong indicator that Mrs. Logan understood that she was not obligated to permit the officers to inspect the premises.

¶16. Logan's objection to the second search, which was also a consensual one, is not entirely clear. Logan himself consented to this second search and, in fact, signed a written consent form in advance of the search. Again, the issue of whether the consent was obtained through threats or coercion such that it was not, in truth, voluntary is one committed primarily to the broad discretion of the trial court. This Court can find no abuse of that discretion in the trial court's decision not to suppress evidence obtained in that search.

¶17. One of Logan's arguments against the third search, conducted under a search warrant, appears to be that information improperly gleaned from the earlier searches of Logan's shop was used to establish probable cause for the warrant. Logan's argument necessarily rests on the foundation that the earlier searches were unconstitutional invasions of federal and state constitutional rights against unreasonable searches and seizures. This Court rejects the charge of impropriety in the earlier searches. Since this third search was conducted pursuant to a warrant obtained on probable cause, there is no arguable basis to exclude any evidence seized during that search.

¶18. The third search was also attacked as having been conducted under an invalid warrant because its scope was too broad to meet constitutional strictures. The Fourth Amendment states that a warrant must describe "the place to be searched, and the persons *or things to be seized*." U.S. Const. amend. IV (emphasis added). The warrant permitted the search and seizure of documents relating to Logan's vehicle repair and rebuilding activities conducted on his premises. Logan contends that this description of items to be searched for in the warrant was too indefinite and did not accurately describe the documents and records actually seized in the search or, in the alternative, described documents that could not possibly have been evidence of the kind of crime then under investigation, i.e., the operation of a "chop shop." His argument depends, in part, on the assertion that the warrant included invoices for purchases of automobile parts and a "chop shop" operator, in the course of operating that kind of illegal activity, would not reasonably be expected to purchase parts.

¶19. On this third search, the officers seized a number of files containing invoices for parts purchases and related expenses regarding the rebuilding of wrecked vehicles. Some of these documents later proved to be forged and were used in this criminal prosecution. As Logan was suspected of operating a "chop shop" where stolen vehicles were brought in and either disassembled to be sold for their constituent parts or disguised so that they would not be readily identifiable, any documents relating to vehicles rebuilt or repaired by Logan at his shop facility would have potential relevance in a criminal investigation. It was not

necessary for the officers to know, in advance, what records, invoices, or other documents Logan would actually have on the premises in order to obtain a warrant to search for such evidence so long as they had a reasonable basis to conclude that some such documentary evidence might be discovered on the premises. In that circumstance, the officers' inability to describe with more certainty the documents that would be sought is not fatal to the warrant.

¶20. This Court holds that there was no search and seizure violation under the facts of this case. The first two warrantless searches were conducted with informed consent, the third search was conducted pursuant to a valid warrant, and evidence obtained therefrom is admissible.

## II. Did the trial court err in allowing insurance investigative files to be introduced into evidence by an investigator who was not involved in the making of those files?

¶21. Virgil Luke, a senior special agent with the National Insurance Crime Bureau (NICB),[1] testified at Logan's trial on behalf of the State. The State used Luke to testify from insurance investigative files prepared by adjusters from various insurance companies which were members of the NICB. Luke did not participate in the making of the files from which he read, and the adjusters who compiled the files did not testify. Luke testified that insurance companies which are NICB members are required to prepare the information contained in these files whenever they process claims for automobiles that are deemed to be total losses. According to Luke, the member insurance companies, in the ordinary course of their businesses, generate this information and then transfer it to the NICB computer database, which Luke has unlimited access to because of his employment with the NICB. He stated that none of the files from which he testified were prepared in anticipation of litigation, and that he did not have to obtain special permission to gain access to them.

¶22. Logan continuously objected to the introduction of information contained in these insurance files on the grounds that they were not properly authenticated, and that they also constituted hearsay without an exception. No objection on lack of confrontational grounds was voiced.

¶23. After his qualifications and experience were enumerated by Luke, the trial judge accepted him as an expert in the field of vehicle identification. Additionally, the State identified Luke as an expert witness in identification and history of vehicles relevant to the defendant's case well in advance of trial. The trial court ruled that the State complied with the rules by giving proper notice to Logan of this witness's testimony.

¶24. The trial court admitted the evidence under Mississippi Rule of Evidence 803(6), the business records hearsay exception, as records of regularly conducted activity of NICB, all as testified to by Like, a qualified witness. The Court of Appeals majority ruled that in allowing Luke to testify from the insurance files, rather than requiring the adjusters who made the files to testify from them, Logan's Sixth Amendment right to confront witnesses was violated.

¶25. Rule 803(6), in relevant part, says:

The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness: Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnosis, made at or near the time

by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or self-authenticated pursuant to Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . .

Miss. R. Evid. 803(6).

¶26. In *Kettle v. State*, 641 So.2d 746 (Miss. 1994), the defendant was charged with the sale of cocaine. As part of the State's case-in-chief, a supervisor at the Mississippi Crime Lab, testifying from laboratory records, stated that the substance sold by the defendant was cocaine. This supervisor did not personally test the substance, and the individual who did test the substance and made the records from which the supervisor read did not testify. The defendant made a pretrial motion in limine, arguing that allowing the introduction of the test results in this fashion violated his Sixth Amendment right to confrontation. This motion was denied, and the trial court ruled that under Miss.R.Evid. 803(6), the supervisor could introduce the test results. This Court reversed, holding that even though the lab records were kept in the course of a regularly conducted business activity, thereby placing them under the hearsay exception, only the person who actually conducted the test could introduce the results into evidence once the defendant invoked his Sixth Amendment right to confrontation. "Under Rule 803(6), therefore, a custodian of the records of the Mississippi Crime Lab may introduce laboratory reports, *except* where the defendant objects on the ground that his Sixth Amendment right to confront the person who prepared the test is being violated." *Kettle*, 641 So.2d at 750 (emphasis added).

¶27. *Ellis v. State*, 661 So.2d 177 (Miss. 1995) is factually similar to *Kettle*, except that the defendant in *Ellis* failed to invoke his Sixth Amendment rights either before or during trial, and was subsequently convicted. This Court affirmed that conviction, and in doing so, distinguished the two cases. "Unlike the defendant in *Kettle*, Ellis did not make a motion in limine nor did he object during trial on the grounds that [the State's witness] was not the actual tester of the cocaine, thus invoking his confrontation right. Since no objection was raised, the testimony of [the State's witness] was properly admitted by the trial court." *Ellis*, 661 So.2d at 182.

¶28. Although cited by the parties, *Lentz v. State*, 604 So.2d 243 (Miss. 1992) is not relevant to the case sub judice, as in that case the defendant, and not the State, successfully sought to have a report entered into evidence, by someone other than the preparer, under M.R.E. 803(6).

¶29. Logan's objections at trial were specifically made on the grounds of hearsay and lack of authentication, and never on Sixth Amendment confrontation clause grounds. In addition to failing to raise the Sixth Amendment issue at trial, Logan also failed to raise it in any pretrial motions. The first time Logan raised this issue was in his appeal to the Court of Appeals. There is sufficient evidence in the record to support a finding that the insurance records which Luke testified from were made by the insurance companies and transferred to the NICB in the course of their regularly conducted business activities, and nothing in the record indicates that these records lacked trustworthiness. Following the precedent set by this Court in *Ellis* and *Kettle*, we hold that the trial court properly allowed Luke to testify from the insurance files. A trial judge cannot be put in error on a matter not presented to him for his decision. *Mills v. Nichols*, 467 So.2d 924, 931 (Miss. 1985). A contemporaneous objection is required to preserve an error for appellate review. *Smith v. State*, 530 So.2d 155, 161-62 (Miss. 1988).

### III. Did the trial court erroneously allow the State's expert to testify outside of the scope of his expertise?

¶30. At trial, without objection from Logan, investigator Luke was accepted as an expert in the field of vehicle identification. However, the Court of Appeals found that the trial court erroneously allowed Luke to testify outside of his area of expertise when he testified about the following issues: (1) damages and repairs to automobiles, (2) whether vehicles were repairable or were total losses, (3) whether particular rivets were factory originals or homemade, and (4) whether or not particular pieces of sheet metal had been repaired.

¶31. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Miss. R. Evid. 702. "[F] ormal education is not the only means of becoming an expert in a field. A witness may qualify to give expert opinion through his experience only." *Cain v. Mid-South Pump Co.*, 458 So.2d 1048, 1050 (Miss. 1984). "A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion." *Sheffield v. Goodwin*, 740 So.2d 854, 856 (Miss. 1999).

¶32. For 22 years, Luke worked for the Mississippi Highway Patrol, spending the last 12 of those years in the auto theft division. In 1985, he began working for the NICB.[2] Luke has been a member of the International Association of Auto Theft Investigators since 1976, serving as its president in 1981. He testified that he has attended and taught numerous week long training sessions hosted by that organization, and that overall, he teaches 15 to 20 auto theft investigation schools a year to law enforcement personnel. Luke has been accepted as an expert in the field of vehicle identification in numerous court throughout Mississippi and also in federal courts in four states.

#### Should Luke have been allowed to testify about damages and repairs to automobiles, and whether vehicles were repairable or total losses?

¶33. When Luke testified about these topics, he was reciting information contained in the investigative files compiled by the NICB member insurance companies. Logan objected to Luke's reading from these insurance records, arguing that they were not sufficiently authenticated and that they lacked proper sponsorship. At no time during or prior to trial did Logan object on Sixth Amendment grounds. Citing M.R.E. 803(6) and finding that these records were kept in the regularly conducted business activities of the NICB and its member insurance companies, the trial court allowed Luke to testify from them, rather than requiring the adjusters who compiled the information contained therein to introduce them. As the record supports a finding that the insurance files were prepared in the ordinary course of business and were trustworthy, and as Logan failed to object on Sixth Amendment confrontation clause grounds when this evidence was introduced, the trial court's decision to allow Luke to introduce this evidence was proper under *Kettle* and *Ellis*.

#### Should Luke have been allowed to testify about whether particular rivets were factory originals or homemade?

¶34. The most visible place in which a vehicle identification number (VIN) can be found is on a vehicle's dash board under the inspection sticker. As an expert in vehicle identification, Luke is obviously familiar

with this location. At trial, he testified that the VIN plate located on the dash board is attached to the vehicle with "stainless steel rosette rivets" which are put into place with an "air rivet gun that has a certain thousand pound pressure." He further explained that using these particular rivets and this particular air rivet gun has been a "trademark" of General Motors since 1968. The specificity of this testimony illustrates that Luke possessed specialized knowledge with regard to rivets, thereby qualifying him to testify as an expert on the topic. Accordingly, the trial court did not commit a clear abuse of discretion in allowing Luke to testify about rivets.

### Should Luke have been allowed to testify about whether or not particular pieces of sheet metal had been repaired?

¶35. In addition to VINs being located on a vehicle's dash board, they are also placed in various inconspicious locations within the vehicle. Luke testified that "confidential VINs" are stamped in two locations on a vehicle's frame, and they are also stamped in the engine and transmission. He testified that part of his training included touring "many assembly plants" to see how vehicles are built and numbered. Additionally, he testified that the examination of sheet metal is a technique that he uses "very much" in the performance of his duties and also in his training. Luke stated that the presence of non-factory original rivets attached to a VIN plate indicates that the plate has been changed and that it is his practice to turn to the confidential VINs concealed within the vehicle's frame upon observance of such a situation. Between his observations at assembly plants, his practice of examining sheet metal in his work and training, and his practice of examining confidential VINs in certain situations, Luke is familiar with automobile frames and sheet metal. In light of this familiarity, he possessed specialized knowledge which enables him to recognize the difference between new and repaired sheet metal. Accordingly, he was qualified to testify on such a topic, and the trial court did not commit a clear abuse of discretion in allowing Luke to do so with regard to particular pieces of sheet metal.

¶36. Accordingly, this Court holds that the trial court acted within its discretion when it allowed Luke to testify about the aforementioned subjects.

### IV. Did the prosecutor make improper comments during closing arguments?

¶37. In its opinion, the Court of Appeals ruled that the prosecutor, during closing arguments, (1) commented on Logan's failure to testify, (2) argued about crimes not charged, and (3) inflamed the jury's passions, all of which were improper and established grounds for a mistrial. The Court of Appeals then ruled that the trial court committed reversible error in failing to declare a mistrial based on these comments.

### Did the prosecutor impermissibly comment on Logan's failure to testify?

¶38. "[E]ach case must be considered individually where there is a question as to the prosecutor's comments on the defendant's failure to testify." *Conway v. State*, 397 So.2d 1095, 1099 (Miss. 1980). "[T]he intention of the [prosecutor] is immaterial; the test is whether the language can be reasonably construed to be a comment upon the failure of the defendant to take the stand." *Lambert v. State*, 190 Miss. 790, 793, 25 So.2d 477, 478 (1946). "[I]t is not error to comment on the defense's failure to offer any evidence to contradict the State's evidence." *Beckwith v. State*, 707 So.2d 547, 584 (Miss. 1997); *see also Smith v. United States*, 234 F.2d 385, 389 (5th Cir. 1956).

¶39. Logan contends that, twice during closing arguments, the prosecutor improperly mentioned Logan's

failure to testify. In the first instance, the prosecutor told the jury "[i]t's clear and the evidence is undisputed that on the dates that you will see in these [applications for salvage certificates of title], as evidenced by these documents, that the defendant went to the subdistrict here in Brookhaven and presented these vehicles for inspection. That evidence is not disputed." In the second instance, the prosecutor stated "Mr. Luke said that the rivets were bad. All these rivets, there was an effort made -- this is significant -- there was an effort made to make these home-made rivets appear as though they had been issued by the factory. This design on the top of the rivets, filing the design on the top of the rivets. That took some effort. But it's clear that these rivets were bad. There's no evidence to the contrary. They were aluminum, not the stainless steel." At this point, Logan objected, asked the trial court to instruct the jury to disregard the comments, and moved for a mistrial. The trial court sustained the objection, admonished the jury, but denied the motion for mistrial.

¶40. When witnesses other than the defendant are available to refute the State's evidence, and these witnesses are not placed on the stand, this Court, in prior cases, has held that comments similar to those about which Logan now complains do not constitute reversible error. ***Conway***, 397 So.2d at 1100 (citing ***Clark v. State***, 260 So.2d 445 (Miss. 1972)).

¶41. With regard to the assertion that he presented the vehicles for inspection in Brookhaven, Logan could have produced alibi witnesses testifying that he was elsewhere at the times he was allegedly in Brookhaven. He could have also produced handwriting experts to testify that the handwriting on the applications was not his own. With regard to the rivets, Logan could have produced experts in the field of metallurgy to refute Luke's contention that the rivets were home-made, and not factory originals.

¶42. Since Logan's testimony was not the only means by which he could have contradicted this so-called "undisputed" evidence and since prosecutors are not forbidden from commenting on a defendant's failure to contradict the State's evidence, the comments of the prosecutor cannot be reasonably construed to be a reference to Logan's failure to testify and, therefore, did not constitute reversible error.

### Did the prosecutor impermissibly comment on crimes for which Logan was not charged?

¶43. Logan was charged with defrauding state government and uttering forgery. Logan asserts that during closing arguments, the prosecutor improperly made comments regarding stolen vehicles when he told the jury that there was evidence that the sheet metal on one of the trucks Logan sought title for had never been damaged. The prosecutor then stated that the only time a vehicle would be subject to salvage when none of the sheet metal had been damaged was when the vehicle was stolen. Logan objected on the grounds that there was no testimony that the vehicle at issue had ever been stolen and also that Logan was not charged with possession of stolen property. The trial court responded to Logan's objection by stating that the jury had been properly instructed. The prosecutor then continued, without objection, stating that the jury could infer from the evidence that the sheet metal on that vehicle was stolen and that was the reason why Logan was presenting these vehicles for title.

¶44. In ***Stevenson v. State***, 244 So.2d 30 (Miss. 1971), the appellant claimed he was greatly prejudiced when the prosecutor referred to matters not in evidence during closing arguments. An objection was made and sustained when the comments were made. However, appellant did not ask the judge to instruct the jury to disregard the comments, nor did he move for a mistrial. Because the appellant failed to move for a mistrial or ask for a limiting instruction, this Court refused to consider whether the prosecutor's comments established grounds for a mistrial. ***Id.*** at 33; *see also* ***Briggs v. State***, 741 So.2d 986, 991-92 (Miss. Ct.

App. 1999).

¶45. Additionally, this Court has held "in order to take advantage of improper argument on the part of a prosecuting attorney, objection must be interposed at the time the statement is made, and the point will not be considered on appeal unless motion for a mistrial is timely made." *Austin v. State*, 384 So.2d 600, 601 (Miss. 1980).

¶46. Because Logan merely objected when the prosecutor made comments about stolen vehicles and failed to ask the trial court for a limiting instruction or a mistrial based upon those comments, that issue was not properly preserved for appeal. However, we caution prosecutors to refrain from making comments similar to those presently at issue. "Prosecutors are limited to arguing facts introduced in evidence, deductions and conclusions that may be reasonably draw therefrom, and application of law to facts." *Holland v. State*, 705 So.2d 307, 343 (Miss. 1997).

### Did the prosecutor make remarks which inflamed the passion of the jurors?

¶47. During the State's closing argument, the prosecutor stated "[a]nd whatever count where you think that the State has proven him guilty beyond a reasonable doubt on his oath, you're required to return a verdict of guilty. If you violate your oath, you will have defrauded the State of Mississippi." Logan objected, and the trial court sustained that objection. The prosecutor then said "I would never, under any circumstances, return in this courtroom a verdict that I did not believe in." Logan again objected, and the trial court sustained the objection.

¶48. Attorneys are given wide latitude during closing arguments. *Rushing v. State*, 711 So.2d 450, 455 (Miss. 1998). The trial judge is in the best position for determining the prejudicial effect of an objectionable comment and is, therefore, vested with discretion to determine whether the comment is so prejudicial that a mistrial should be declared. *Alexander v. State*, 602 So.2d 1180, 1182 (Miss. 1992). "[T]he test to determine if an improper argument by a prosecutor requires reversal is whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice." *Dunaway v. State*, 551 So.2d 162, 163 (Miss. 1989).

¶49. In the remarks at issue, the prosecutor correctly told the jury that it was required to return a guilty verdict if the State proved Logan guilty beyond a reasonable doubt. Although the other comments about which Logan complains were improper, we cannot say that he was unjustly prejudiced by them, particular when they are viewed in the context of a trial which lasted eight days.

¶50. For the reasons stated herein, we hold that the prosecutor did not make improper comments at trial which established grounds for a mistrial.

### CONCLUSION

¶51. While the Court of Appeals erred with respect to some issues as indicated herein, it reversed the judgment of the trial court on other grounds not here challenged. Accordingly, its judgment is affirmed in all respects not inconsistent with this opinion, and the judgment of the trial court is reversed and this matter is remanded to that court for further proceedings.

¶52. **AFFIRMED.**

**PITTMAN AND BANKS, P.JJ., WALLER AND COBB, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. SMITH, MILLS AND DIAZ, JJ., NOT PARTICIPATING.**

1. Luke said, "NICB is a nonprofit company founded in 1912 that is funded by the insurance industry that hires people that are experts in their field and give them back to law enforcement and do training . . . ."

2. Luke testified that he is an employee of the NICB, not of the particular insurance companies which are NICB members. These member insurance companies are Luke's clients, not his employers.