# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01747-COA

**DAVID JONES A/K/A DAVID BERNARD JONES**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/17/2019 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | THOMAS P. WELCH JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/16/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1. A Forrest County Circuit Court jury convicted David Jones of armed robbery. The trial court sentenced David to twenty-five years in the custody of the Mississippi Department of Corrections (MDOC), with five years suspended and twenty years to serve, and placed him on five years of post-release supervision.

¶2. David now appeals his conviction and sentence. On appeal, David asserts the following assignments of error: (1) the State failed to produce exculpatory evidence prior to trial; (2) the State made improper statements during closing arguments; (3) the verdict was against the overwhelming weight of the evidence; and (4) the cumulative errors warrant

reversal.  After our review, we find no error.  We therefore affirm David's conviction and sentence.

## FACTS

¶3.    On November 21, 2016, David agreed to drive Aaron Jones,[1] Virgil Luckett, and Carlos Sibley to an apartment complex called "The Flats."  Upon arriving at The Flats, three of the men exited David's vehicle, wearing bandanas over their faces.  They came to Irene Martin's apartment and knocked.  Believing it was someone bringing her granddaughter's seizure medication, Martin opened the door.  Martin testified that three men wearing bandanas over their faces burst in, throwing Martin to the floor.  Martin testified that one of the men held a gun to her head and ordered to her to get on the floor.  According to Martin, the men started kicking her and asking her "where's the money?" and "where's the dope?".  Martin replied that she had neither.  The men threatened to kill Martin and her infant granddaughter, so Martin told them to take what money she had in a drawer.  The men took $250 as well as her prescription medication.  Martin and her seventeen-year-old granddaughter, Delixis Page, and her college-aged daughter, Taliyah Martin, all testified at trial that they could not identify any of the men because the men had covered their faces with bandanas.

¶4.    Several days after the robbery, Aaron, Sibley, and Luckett were arrested.  Thereafter David turned himself in.  David, Aaron, Sibley, and Luckett were indicted for armed robbery and conspiracy to commit armed robbery.  David pleaded not guilty to both charges and was

---

[1] Aaron has no relation to David.

2

granted a severance to have his case tried separately from Aaron, Luckett, and Sibley. At trial, the State elected not to pursue the conspiracy count.

¶5. The record reflects that Sibley pleaded guilty for his role in the robbery. As part of his plea bargain, Sibley agreed to testify against David. At trial, Sibley testified that on November 21, 2016, he overheard Aaron call David and ask him to drive Aaron, Sibley, and Luckett to commit a robbery. Sibley stated that David agreed and picked up the three men in his vehicle. The men instructed David to drive them to a location for the purpose of robbing a man known as "Big 60." According to Sibley, David was aware that he was driving the men to the location for the purposes of committing a robbery. Sibley testified that David responded that he would participate by driving them "as long as he gets some of the money."

¶6. Sibley testified that upon arriving at Big 60's house, he, Aaron, and Luckett exited the vehicle while David remained inside. The men knocked on the door. When they realized that Big 60 was not home, the three men returned to David's vehicle. According to Sibley, David asked, "[W]hat's next, . . . is this over?" The men replied "no," so David asked, "[W]here we going?" Aaron instructed David to drive to The Flats. Sibley testified that the men intended to rob a man known as "Big Joe," who lived at The Flats.

¶7. Sibley testified that upon arriving at The Flats, he remained in the car, and David, Aaron, and Luckett exited the vehicle. Sibley stated that he did not know where the men went after they exited the vehicle. When asked during cross-examination why he stayed in the car, Sibley testified that the only person he agreed to rob that evening was Big 60. Sibley

3

also stated that none of the men were being held at gunpoint or forced to participate in the robbery.

¶8. Sibley stated that when the men returned to the vehicle, Aaron gave David $12 for gas money. The men went to the Junior Food Mart, and David exited the vehicle to get gas and pay for it. Sibley testified that after David got gas, he drove the men home.

¶9. Detective Jeremy Dunaway with the Hattiesburg Police Department testified that his investigation of the robbery first led him to the other suspects. Detective Dunaway stated that David later voluntarily turned himself in to the police. Detective Dunaway testified that David told him that he feared Aaron, so he waited until Aaron and Luckett had been arrested before coming forward. Detective Dunaway stated that David provided a written statement to the police. Detective Dunaway read the written statement for the jury.

¶10. In his written statement to police, David admitted he drove Aaron and the others to The Flats on November 21, 2016. According to the written statement, David said that Aaron called him and asked David to pick him up, telling David that he would give him gas money. David agreed. When he arrived to pick up Aaron, David stated that Luckett and Sibley also entered David's vehicle. David proceeded to drive where Aaron instructed, first to the house of a man known as "Big 60" and then to The Flats apartments. David stated that before they turned into the apartment complex, Aaron showed David his gun. David expressed in his statement that after Aaron showed him the gun, he was afraid and therefore did everything Aaron asked.

¶11. Upon arriving at The Flats, Aaron told David to park and wait; David complied.

David stated that when Aaron returned, he gave David $12. David told Aaron that he wanted to go home, but according to the statement, Aaron was "still waving the [gun] around." David stated that Aaron gave him some gas money, and he stopped at a Junior Food Mart to get gas. David later dropped the others off and went home.

¶12. Detective Dunaway also interviewed David at the police department. Detective Dunaway testified that David told him that during the entire incident, he stayed in the vehicle the whole time and that he was being held at gunpoint against his will. Detective Dunaway commented that if David "stayed with the vehicle [during the robbery at The Flats], he had ample opportunity to leave that location."

¶13. Detective Dunaway also testified that in the course of investigating the robbery, he collected surveillance video from the Junior Food Mart and spoke to a clerk who was working the register that evening. According to Detective Dunaway, the clerk stated that although David entered the Junior Food Mart that evening, at no time did David ask for help or advise the clerk that he was in trouble.

¶14. At trial, David testified in his own defense. David informed the jury that he did not know Aaron well, but that for a month before the robbery he would occasionally give Aaron rides in exchange for money. David testified that on November 21, 2016, Aaron called him, and David agreed to give him a ride. When David arrived at Aaron's location, Aaron and two other men entered his vehicle. Aaron told David that he needed a ride to the other side of town. David then drove him to a blue house; Aaron got out and came back with a large gun. David asked him what was going on, and Aaron replied, "Just drive."

5

¶15. David testified that upon seeing the gun, he was scared, and he stated that Aaron "actually held me at gunpoint the whole time he was in my car." David drove the men to The Flats and parked where Aaron instructed. David testified that the men exited his vehicle and that he remained in the car with the ignition on and waited for them. David testified that when the men returned to his vehicle, they gave him some money. David admitted that he accepted the money. When asked, "Where do you think the money came from?" he responded, "From the place they went to."

¶16. David testified that later that evening, he drove the men to a gas station. Upon Aaron's orders, David exited the vehicle, got gas, and then entered the gas station to pay for the gas. David testified that he then returned to his vehicle, and Aaron ordered him to return to the gas station to buy some beer. David returned to the gas station and bought beer. David testified that he then dropped the men off and returned to his home. David further testified that while dropping the men off, Aaron threatened David and instructed him not to call the police.

¶17. David explained that after the robbery, he waited until Aaron and Luckett were arrested before turning himself in. David testified that he was scared of Aaron, and he described Aaron and Luckett as violent. David also testified that Aaron knew where David lived as well as where his mom lived.

¶18. The jury returned a verdict finding David guilty of armed robbery. David filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, in which he argued the same issues he raises on appeal. The trial court denied David's motion. David

now appeals.

## DISCUSSION

### I.    *Brady*[2] **Violation**

¶19.    David argues that the State committed a *Brady* violation by withholding exculpatory evidence; namely, that Aaron was indicted for intimidating David by making threats.  David maintains that the witness-tampering indictment against Aaron was material and exculpatory and that the State's failure to produce it in discovery violated his due process rights as established by law.

¶20.    In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In *Manning v. State*, 929 So. 2d 885, 891 (¶15) (Miss. 2006), the Mississippi Supreme Court established a four-part test to assess whether a *Brady* violation had occurred, thus mandating a new trial:

> The defendant must prove: (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

¶21.    The supreme court has emphasized that when examining whether a *Brady* violation occurred, "the question is whether there is a 'reasonable probability' that the verdict would have been different but for governmental evidentiary suppression which 'undermines

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

confidence in the outcome of the trial.'" *Carr v. State*, 873 So. 2d 991, 1000 (¶12) (Miss. 2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

¶22. The record reflects that on February 23, 2018, Aaron was indicted for witness tampering. The indictment charged that "between November 26, 2016 and December 31, 2016, Aaron did unlawfully . . . attempt by use of a threat directed at [David and Luckett], who were a witness or who may have been called as a witness in an official proceeding, to influence the testimony of [David, Luckett, and Sibley] . . . ." During cross-examination at trial, Detective Dunaway testified that he investigated the threats Aaron had made against David.

¶23. At trial, David testified that Aaron threatened him during the commission of the November 21, 2016 robbery and that he was afraid of Aaron. However, the dates listed for Aaron's indictment state that the intimidation and threats occurred "between the dates of November 26, 2016, and December 31, 2016"—after the November 21, 2016 robbery. In his appellate reply brief, David "concedes that the date range in the indictment was after the [a]rmed [r]obbery" that occurred on November 21, 2016. We therefore find that the indictment is immaterial as to whether Aaron threatened David during the commission of the robbery.

¶24. Furthermore, after our review, we find that David failed to demonstrate that a reasonable probability exists that the outcome of his trial would have been different if the State had provided the indictment during discovery. Our supreme court has acknowledged that "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was

8

so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Minor v. State*, 89 So. 3d 710, 714 (¶11) (Miss. Ct. App. 2012) (citation omitted). David has not met this burden.

¶25. After our review, we find that David failed to meet his burden of proving that the State committed a *Brady* violation. *See Manning*, 929 So. 2d at 891 (¶15).

## II. Prosecutorial Misconduct

¶26. David next argues that he is entitled to a new trial based on comments made by the State during closing argument. David asserts the State committed prosecutorial misconduct in its closing arguments by improperly making send-a-message statements and burden-shifting arguments.

¶27. The record reflects that during the State's closing argument, David objected to several comments made by the State:

| | |
|---|---|
| STATE: | . . . He [David] can't take that defense 'cause he's not in danger. Drive off. Help the Martins out. |
| DEFENSE: | Objection, Your Honor. That's a send-a-message argument. |
| THE COURT: | Sustained. |
| STATE: | No, if— |
| THE COURT: | The jury will disregard that |
| STATE: | —he lets me finish. |
| THE COURT: | —last comment. |
| STATE: | The defendant had the opportunity to call the police after he left to care about the victims that he know [sic] just |

9

got robbed.

The State also asked the jury, "Can a defendant confess, . . . and then say I shouldn't be held accountable. 'Cause if that's so, what's the Martins gonna do? Can they ever walk in their apartment and feel safe?"

¶28.  David later objected to a different "send a message" remark:

STATE:           The terror is not deserved. There has to be some level of accountability.

[DEFENSE]:       Your Honor, again, I'm gonna object. That's yet another send-a-message argument.

THE COURT:       You're getting mighty close, Mr. Hood. The jury will disregard that last remark. Let's move along.

¶29.  The record reflects that David also objected to the State's comment regarding the burden of the defense:

STATE:           . . . Defense counsel stood up and said he was in fear for his life. You remember that. I wrote that down on a sheet of paper. That's what he said. He was in fear for his life. Where's the fear if you stay in the car while the person gets out? Where's the fear when you pump your gas? And when you don't get all your gas, you pump you go back in there until you get all your gas. Where's the fear when you take this woman's money? Where's the fear when you don't call police? That's his words. Have him prove what fear is.

DEFENSE:         Objection, Your Honor. That's absolutely shifting the burden.

STATE:           He has to put up evidence. Come on.

THE COURT:       Let's move along.

¶30.  On appeal, the State correctly asserts that although David's counsel objected to

10

remarks made by counsel in the State's closing argument, David did not ask for a mistrial or mention the matter until he raised it in his motion for judgment notwithstanding the verdict. We recognize that "in order to take advantage of improper argument on the part of a prosecuting attorney, objection must be interposed at the time the statement is made, and the point will not be considered on appeal unless motion for a mistrial is timely made." *Logan v. State*, 773 So. 2d 338, 349 (¶45) (Miss. 2000) (quoting *Austin v. State*, 384 So. 2d 600, 601 (Miss. 1980)). In *Keller*, the supreme court explained that:

> [I]t is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment.

*Keller v. State*, 138 So. 3d 817, 864 (¶127) (Miss. 2014) (quoting *Flowers v. State*, 842 So. 2d 531, 550-51 (¶52) (Miss. 2003)).

¶31. The record before us reflects that David's counsel failed to request a mistrial in addition to raising his objection to the comments. We therefore must hold that David is procedurally barred from raising this issue on appeal. *See also Smith v. State*, 258 So. 3d 292, 307 (¶¶42-44) (Miss. Ct. App. 2018).

### III.   Weight of the Evidence

¶32. David argues that the jury's verdict is against the overwhelming weight of the evidence and that, as a result, the trial court erred in denying his motion for a new trial. In

support of his argument, David claims that the State "failed to produce a single credible witness to contradict [his] statement and testimony regarding his being under duress." David also argues that Sibley was the only witness for the State who attempted to contradict David's trial testimony. David maintains that Sibley's testimony was not credible.

¶33. We recognize that a defendant may challenge the weight of the evidence in a motion for a new trial. *Woods v. State*, 242 So. 3d 47, 59 (¶51) (Miss. 2018). In reviewing a challenge to the weight of the evidence, the reviewing court must "weigh the evidence in the light most favorable to the verdict" and "only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017).

¶34. The transcript before us reflects that the jury heard conflicting testimony regarding what happened during the robbery. David testified that he agreed to drive Aaron, Luckett, and Sibley to The Flats. However, David testified that once they arrived at The Flats, he stayed inside the car and waited for the men to return.

¶35. The jury also heard Sibley's testimony that David agreed to drive the men to commit a robbery. However, Sibley testified that upon arriving at The Flats, *he* remained in the car and that David, Aaron, and Luckett exited the car. In either situation, the testimony shows that David participated in the robbery. Additionally, David admitted that he accepted money that he knew was obtained during the robbery. The supreme court has held that "when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Robinson v. State*, 247 So. 3d 1212, 1227 (¶31) (Miss.

12

2018). Further, the jury may draw reasonable inferences from the evidence as it deems justified. *Jones v. State*, 149 So. 3d 1060, 1066 (¶26) (Miss. Ct. App. 2014).

¶36.    After our review, we find that the jury's verdict was not contrary to the overwhelming weight of the evidence, and therefore the trial court did not err in denying David's motion for a new trial.

## IV.    Cumulative Error

¶37.    Finally, David argues that the cumulative errors of the trial court warrant a judgment of acquittal in his favor or, in the alternative, a new trial.

¶38.    "The cumulative error doctrine stems from the doctrine of harmless error, which holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Lyons v. State*, 237 So. 3d 763, 774 (¶46) (Miss. Ct. App. 2017). "However, reversal based upon cumulative error requires a finding or findings of error." *Id*. Furthermore, "prejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error." *Mouton v. State*, 227 So. 3d 1079, 1086 (¶28) (Miss. 2017). The supreme court has held that "one potential harmless error does not amount to cumulative error." *Id*.

¶39.    Because this Court finds no error in any of David's reviewable issues on appeal, the cumulative-error doctrine does not apply. *See Morrow v. State*, 275 So. 3d 77, 85 (¶31) (Miss. 2019) ("Because no cumulative harmless errors require reversal, the cumulative error doctrine is inapplicable."); *see also Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007)

13

("However, where there is no error in part, there can be no reversible error to the whole.").

This issue is without merit.

¶40. Based on the foregoing analysis, we affirm David's conviction and sentence.

¶41. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, LAWRENCE AND C. WILSON, JJ., CONCUR. McDONALD, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McCARTY, JJ.**

**McDONALD, J., DISSENTING:**

¶42. I respectfully dissent from the majority opinion. I believe David Jones is entitled to a new trial because of the *Brady* violation, namely, the State's failure to produce Aaron Jones's witness-tampering indictment, which goes to the very heart of David's defense that Aaron threatened him into participating in the Martin robbery. Additionally, because the evidence did not include the material that the State failed to provide, we cannot and should not find that the overwhelming weight of what was presented to the jury was sufficient to support a guilty verdict that resulted in a young working man, with a negligible criminal past, to be incarcerated for twenty years. Accordingly, I would reverse and remand this case for correction of the errors and a new trial.

**Facts and Procedural History**

¶43. The majority opinion has outlined many of the salient facts, but there are a few that I feel are important to add. David testified that prior to this incident, he had been working at Pace Auto Sales for the past five years. To supplement his income, David would give people rides for money to pay for gas and to have something in his pocket. He lived with his

girlfriend and their eight-month-old baby. David said that he had seen Aaron around the neighborhood but did not really "know" him. For about a month prior, he had driven Aaron places, such as Aaron's mother's house, for money.

¶44. There was no testimony that David was involved in any other crime with Aaron or Sibley prior to the robbery that day. Sibley, on whose testimony the State relies, did not even know David except from having seen him around the apartments where he lived. Sibley testified that he and Aaron planned the robbery and that they planned to use someone else to drive them. But that person's car would not start, so Aaron called David.

¶45. David testified that on the night in question, Aaron called him, and David agreed to give him a ride. When he arrived, David was surprised when others got in the truck as well. Aaron said he needed a ride to the other side of town. David drove him to a blue house; Aaron got out and came back with a large gun. David asked what was going on, and Aaron just pointed the gun at him and told him to drive. David testified he was frightened and that Aaron literally held a gun on him during this time. Contrary to Detective Dunaway's speculative opinion that David could have driven away while the others were committing the robbery, David testified that he did not leave because Aaron knew where David and David's mother lived. Nor did David take any action at the gas station for the same reason. Before dropping everyone off, Aaron threatened David one more time. Because he feared Aaron, David said he did not tell anyone right away but waited until Aaron was incarcerated. At that point, he voluntarily turned himself in. When he presented himself to the police, David gave a statement consistent with his testimony later at trial.

¶46. Jeremy Dunaway, a detective with the Hattiesburg Police Department, testified that he undertook an investigation of these threats to David which included follow up at the Forrest County Jail. David and his defense counsel were unaware of the results of that investigation, despite requesting any potentially exculpatory material through a motion for discovery and a motion to compel thereafter. Only after the trial was over did they learn that on February 23, 2018, Aaron had been indicted for witness tampering based on, among other things, threats to David. Specifically, the indictment read that

> between November 26, 2016 and December 31, 2016 Aaron did unlawfully . . . attempt by use of a threat directed at David Bernard Jones, Virgil Stephen'Lee Luckett, who were a witness or who may have been called as a witness in an official proceeding, to influence the testimony of David Bernard Jones, Virgil Stephen'Lee Luckett and Carlos Akeem Sibley . . . .

**Analysis**

**I.    Discovery Violation**

¶47. "It is well established that the State has a duty to turn over all exculpatory material relevant to a defendant's case." *Hall v. State*, No. 2017-KA-00924-COA, 2019 WL 6875360, at *5 (¶25) (Miss. Ct. App. Dec. 17, 2019). This mandate has been the law for over fifty years since *Brady v. Maryland*, 373 U.S. 83 (1963), where the United States Supreme Court held that due process requires the government to disclose favorable, material evidence not otherwise discoverable through due diligence. *Brady,* 373 U.S. at 87. A *Brady* violation occurs when prosecutors fail to turn over evidence known to the government or police investigators. *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). The good or bad faith of the prosecution is irrelevant.

16

*Keyes v. State*, 281 So. 3d 40, 42 (¶14) (Miss. Ct. App. 2019).

¶48. To establish a *Brady* violation, a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *Malik v. State*, 249 So. 3d 416, 421 (¶13) (Miss. Ct. App. 2017). However,

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434.

¶49. In this case, David's sole defense was that he was coerced into participating in the robbery by Aaron's threats. Therefore, anything related to threats of David by Aaron is obviously relevant and probative. The State possessed and failed to produce the witness-tampering indictment against Aaron, which included these threats made to David. But the majority opinion concludes that it was immaterial to David's guilt on the robbery conviction because of the dates of the alleged threats stated in the indictment, i.e., between November 26 and December 31, 2016. The robbery and threats to David occurred on November 21, 2016. The majority opinion says that because of those dates, the indictment was immaterial as to whether Aaron threatened David during the robbery. I believe the evidence shows

17

otherwise.

¶50.    After the robbery, David hid until Aaron was arrested. David then came forward and gave his statement on November 25, 2016, after which Investigator Dunaway began to investigate the threats to David and found that Aaron had made threats to others as well. These formed the bases for the ultimate indictment against Aaron. There was no proof that Aaron and David had any contact between November 26 and December 31, 2016.[3] Yet the indictment includes threats to David, which could have been the threats that David reported during the robbery. Therefore the dates of the indictment are not as important as the fact that it includes threats to David during the robbery, which are clearly material.

¶51.    The majority opinion also concludes that David failed to demonstrate a reasonable probability that the outcome of the trial would have been different. But the indictment itself and its ramifications create such a reasonable probability. If the evidence of these threats was strong enough to convince a grand jury to indict Aaron, this indictment should have been provided to David to enable him to develop further proof through at least the cross-examination of Sibley and Investigator Dunaway. "Favorable evidence includes that which is either directly exculpatory or items which can be used for impeachment purposes." *Roberson v. State*, 287 So. 3d 219, 246 (¶97) (Miss. Ct. App. 2017). Who knows what other direct evidence the defense may have uncovered had he had Aaron's indictment before the trial. Additionally, it is undisputed that Aaron and Sibley planned the robbery and first called someone else to be their driver. None of the victims identified David. The only proof that

_____

[3] During this time Aaron was incarcerated but David was not. David was not indicted until over a year later in February of 2018 and not arrested until February 26, 2018.

18

David acquiesced and joined in the plan is Sibley's testimony and the only proof David had to rebut this was his own statement and testimony. However, if David had known of the indictment and been able to present it to a jury, or discovered other evidence through it, at least the jury would have heard all the evidence pertinent to this case and may well have reached a different verdict. "If a reasonable probability exists that the outcome of a case would have been different had the evidence been disclosed, reversal is warranted." *Crawford v. State*, 218 So. 3d 1142, 1164 (¶78) (Miss. 2016). Without it, in my opinion, confidence in the outcome of David's trial is undermined. Aaron's indictment was favorable and material to David's defense and qualifies as *Brady* material. Accordingly, I would find that the State's failure to provide the witness-tampering indictment was a *Brady* violation that warrants reversal of David's conviction.

## II. Overwhelming Weight of the Evidence

¶52. In considering a challenge to the weight of the evidence, we "view the evidence in the light most favorable to the verdict and will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Johnson v. State*, 234 So. 3d 1248, 1250 (¶11) (Miss. 2017) (internal quotation marks omitted). We must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* It is the jury's role, not ours, to assess the weight and credibility of the evidence, *Pruitt v. State*, 122 So. 3d 806, 809 (¶8) (Miss. Ct. App. 2013), and it may draw such reasonable inferences from the evidence as it deems justified, *Jones v. State*, 149 So. 3d 1060, 1066 (¶26) (Miss. Ct.

19

App. 2014).

¶53. We have not disturbed verdicts where numerous witnesses were called to corroborate the victim's testimony which was also supported with forensic evidence, as in *Jones.* Nor did the supreme court reverse a conviction when an eye witness failed to identify a defendant in court because it found other evidence, including two witnesses who testified that the deceased's dying declaration was that the defendant had shot him. *Stevenson v. State*, 283 So. 3d 697, 700 (¶9) (Miss. 2019). In a recent case, *Story v. State*, No. 2018-KA-00464-COA, 2019 WL 5704135, (Miss. Ct. App. Nov. 5, 2019), *cert. denied*, Order, No. 2018-CT-00464-SCT (Miss. May 5, 2020), Story claimed that there was insufficient evidence to prove his guilt on capital murder, kidnapping and conspiracy to commit robbery charges where he was merely present with the shooter at the time. *Id*. at *7 (¶32). However, there was eyewitness testimony that Story was with the shooter, when the victim was killed. *Id*. at *2 (¶9). The eyewitness also testified that Story and the shooter kidnapped him. *Id*. at (¶10). The driver of the vehicle Story and others who rode with Storey testified extensively on Story's role. *Id*. at *3 (¶13). We found that it was abundantly clear that Story intended to associate himself with the shooter, *id*. at *7 (¶34), fully participated in the events, *id*. at *8 (¶35), and had move involvement that a "mere presence," *id*. at *1 (¶3).

¶54. But in the case here, unlike the proof in *Story*, the only evidence the State presented that tied David into the robbery in a culpable way was the testimony of the convicted co-defendant, Sibley. Even he admitted that David did not plan to rob anyone; it was he (Sibley) and Aaron that planned it. Aaron only called David because their driver could not deliver.

Sibley's testimony breaks down completely when he testified that David, not he, exited the vehicle at The Flats. The only other physical evidence entered was David's statement that is consistent with David's testimony that he was not one of the robbers and the innocuous Sonic's video of David purchasing gas. Other than that, there is merely suggestion and innuendo by the State.

¶55. Because the jury is the arbiter of the evidence, it is important that all evidence be presented to them. In this case, because of the *Brady* violation and the State's withholding critical evidence that supports David's testimony, it is impossible to conclude that the weight of the evidence supports a guilty verdict. When we know that there is more critical evidence that the jury did not see or hear, we cannot simply conclude that the verdict was or was not contrary to the evidence. Accordingly, I am of the opinion that there was a basis for David's post-trial motion, and I would reverse and remand for a new trial.

**WESTBROOKS AND McCARTY, JJ., JOIN THIS OPINION.**